[L. A. No. 3519.   In Bank.—June 28, 1916.]

## ISAAC RYDER, Appellant, v. J. E. BAMBERGER et al., Respondents.

APPEAL—ORDER DENYING NEW TRIAL.—INFERENCES FROM ADMITTED PROBATIVE FACTS—LACK OF JURISDICTION OF APPELLATE COURT.— The appellate court is without power, upon an appeal from an order denying a new trial, where all the evidence is brought up on the appeal, to draw its own inferences from the admitted probative facts, as to do so would be the making of findings of fact, which is a matter within the peculiar and exclusive province of the trial court or jury.

ID.—DAMAGES FOR FRAUD—EVIDENCE—DRAWING OF INFERENCE FROM PROVED FACTS—DUTY OF COURT.—In an action for damages for fraud, if there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of the court or jury to draw the inference favorable to fair dealing.

ID.—FAILURE TO FIND FRAUD—INFERENCE OF TRIAL COURT—APPEAL.— Where in an action for damages for fraud the trial court has refused to infer from the admitted probative facts that fraud has been committed, its action in so finding is not open to question on appeal.

ID.—EVIDENCE—PROOF OF FRAUD—WHEN INSUFFICIENT.—Fraud must always be proved, though not necessarily by direct evidence, but when the plaintiff's case goes no further than to establish a state of facts from which the inference of fraud may or may not be reasonably drawn, he has failed to establish his charge by a preponderance of the evidence, and it becomes the duty of the court or jury to find in favor of innocence and uprightness.

ID.—CORPORATION LAW—PURCHASE OF STOCK FROM OTHER STOCK-HOLDERS—RIGHT OF DIRECTORS AND OFFICERS.—Directors and officers of a corporation have the right to purchase the shares of stock of other stockholders, where the transaction is free from fraud; and they are not bound to acquaint a stockholder willing to sell his stock with facts which would enhance the price of the stock, as they are only trustees for the stockholders as to the management of the corporation and not in their private dealings.

ID.—SALE OF CORPORATE STOCK—PURCHASE BY OFFICERS AND DIRECT-ORS—LACK OF CONFIDENTIAL RELATIONSHIP—GOOD FAITH—SUFFI-CIENCY OF FINDINGS.—In this action brought by a stockholder of an oil company for damages for fraud in being induced by the alleged misrepresentations and concealments of the defendants,

who were directors and stockholders of the company, to sell his stock to them for less than its alleged value, it is held that no relationship of trust or confidence existed between the parties which imposed upon the defendants the duty to disclose to the plaintiff the full and complete nature of the transactions involved, and that the finding that defendants acted with unimpeachable good faith is fully sustained by the evidence, and is conclusive upon appeal.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. N. P. Conrey, Judge.

The facts are stated in the opinion of the court.

Flint, Gray & Barker, L. W. Jutten, Frank P. Deering, Joseph D. Redding, and Henry S. Van Dyke, for Appellant.

W. E. Mitchell, Hunsaker & Britt, Gibson, Dunn & Crutcher, and Henry Ach, for Respondents.

HENSHAW, J.—Plaintiff's action is for damages for fraud. The gravamen of his complaint is that he was a stockholder in the Salt Lake Oil Company, and was induced by the misrepresentations and concealments of the defendants to sell his stock for two dollars a share, when in truth and in fact it was worth very much more. He lays his damages in the sum of $21,671. Certain of the defendants, and principally the defendants Bamberger, Wood, Price, and Phillips, are specifically charged with the active perpetration and consummation of the frauds, while certain other of the defendants, Chanslor and Porter, while not active in the perpetration of the frauds, are in effect charged as joint conspirators and reapers of the profit.

In outline, plaintiff's cause of action may be thus stated: He was a stockholder of the Salt Lake Oil Company of California, owning 1,667 shares of its capital stock. The total capital stock, all issued, was five hundred thousand shares, of the par value of one dollar per share. Of the defendants, Wood was president, Price manager, J. E. Bamberger a large stockholder and a director of the company, and Phillips a director and secretary. Wood, Bamberger, and Price controlled the company and had pooled the majority of the stock, which they owned. Defendant Porter was the general man-

ager of the Associated Oil Company—a very large and prosperous company capitalized for forty million dollars. Defendant Chanslor was one of the directors of the Associated Oil Company. These men conspired to incorporate, and did incorporate, the Amalgamated Oil Company, which was to be a mere holding company, designed to acquire controlling interests in sundry oil companies and market their products. One-half or more of the stock of the Amalgamated Oil Company was to be sold to the Associated Oil Company, which it was understood should direct the affairs and control the destiny of the Amalgamated Oil Company. The Salt Lake Oil Company was producing oil and its wells were located near Los Angeles. The Associated Oil Company had large contracts for the supply of oil in and in the neighborhood of Los Angeles, which contracts it could much more profitably fill by using the oil of the Salt Lake Oil Company rather than by using its own oil, as its wells were much farther away from this southern territory, and the delivery necessitated a long haul by railroad. It was in contemplation that the Associated Oil Company, thus owning a control of the Amalgamated Oil Company, would turn over to the latter company most of its contracts for the delivery of oil in the southern part of the state, thus insuring to the Salt Lake Oil Company a ready and profitable market for its product. This conspiracy had been effectuated to the extent of an agreement between the conspirators for the organization of the Amalgamated Oil Company, and for the assignment to that company of the valuable oil contracts of the Associated Oil Company, when, for the purpose of securing to their own personal ends and gain the minority stock of the Salt Lake Oil Company, on October 25, 1904, Wood, Bamberger, and Price, in collusion with Porter and Chanslor, sent to all the minority stockholders and stockholders outside of the pool a letter and report. The letter spoke of the difficulty of financing the company and in avoiding assessments on its stock, due to the depressed condition of the oil market and the strenuous competition at unremunerative prices for the sale of oil; that these conditions threatened "to leave values very uncertain for an indefinite period," and that therefore "the principal owners of the capital stock have accepted an offer of two dollars per share. In doing so we deem that the best values that can be secured for our stock for some period in the future has been accom-

plished. We have obtained for every stockholder until the first day of December, 1904, the opportunity of having his stock taken over at two dollars per share cash. Any other policy would have to result in assessments and a radical competition in the disposing of the oil.'' The letter further set forth that the stockholders would receive this two dollars per share for their stock upon sending it, properly indorsed, to the Security Savings Bank of Los Angeles. Accompanying each of these letters was a copy of the report of defendant Price, the manager. This report demands exposition. Before making it, however, and in explanation of the report itself, it is pertinent to point out that the Salt Lake Oil Company was the lessee of one thousand acres of land, holding this land under the terms of a most stringent lease. The lease called for continuous drilling until at least one producing well was obtained upon every three acres of oil-producing land. It provided for the relinquishment by the lessees at the expiration of five years after the successful completion or the abandonment of the first well of all of the leased premises except such portion as should have been demonstrated to be oil producing in paying quantities by actual operation at the time. It allowed a suspension of developing but not of drilling for a period not exceeding three months whenever oil could not be sold at the wells in excess of fifty cents a barrel. The royalty of the lessor was a gross one-sixth of the oil product, with free transportation of this one-sixth through any conduit laid by the lessee. There were other terms unnecessary to set forth of equally drastic character, and of the lease it may be said finally, that years after the date of the transactions here complained of, and after enormous expenditures of money in the effort to secure oil, but two hundred and ninety acres of the one thousand acres had proved to be oil land, while at the time of these transactions but one hundred and sixty acres had so been proved.

Returning now to the report above referred to. That report declared that a group of twenty wells had been sunk, all of which were producers, excepting numbers 1 and 2. Four or five more wells were under way. The financial statement was unsatisfactory. The liabilities were fifty-two thousand dollars over all available assets. Notes payable amounted to fifty-five thousand dollars, a part of which had been advanced by the directors personally, and a large part of which

was due to the bank on demand notes. Heavy expenditures
were necessary to comply with the terms of the lease, and the
additional requirements anticipated for 1905 over and above
all possible receipts was estimated at forty thousand dollars.
The condition of the oil market in Southern California, and
particularly that condition as it affected the Salt Lake Oil
Company, was represented as uncertain and perilous, with no
prospect of improvement in the immediate future. We may
now, with advantage, quote from the report itself, for the
reason that it contains the asserted misrepresentations upon
which appellant relies, representations, however, every word
of which the trial court found to be fair and true. The set-
ting forth of this report will relieve from the necessity of
elaborating in this statement of facts, upon the existing con-
dition of affairs.

"The pipe line is now under construction and our contract
calls for 80% payment on these expenditures every 10 days.
Our monthly expenses must be met promptly. The amount
on special account is long past due and should be taken care
of. Our loan at the bank is due on call. Although that may
be continued for a period of time, as long as business looks
prosperous for the company, but in view of the unsettled con-
ditions of the oil market, the tendency of prices downward,
there is no certainty as to how long the bank may look favor-
ably upon the loan. It requires $20,000.00 or $25,000.00
working capital to swing our business from pay-day to pay-
day, at the present time. The plans we have under way, neces-
sary to be completed within the next 90 days, will create a
total liability, including working capital, of about $120,000.00.
The company as a corporation has no bank credit. The per-
sonal endorsements that have secured credit for the company
in the past cannot be depended upon for securing any addi-
tional loans, in view of the fact that the bank requires a one-
day's sight note, and the certainty of a much lower price for
oil, and the uncertainty of securing a market in quantity and
price for the production of the company to meet the require-
ments. Strenuous competition makes it extremely hazardous
for a competing company to be involved in debt to anyone.

"The situation of the oil market at the present time is very
unsettled. The market at the present time is practically sold
up in periods of 1, 2 and 3 years. Any additional trade we
might secure, unless it be a sale of oil to those who have se-

cured business, will be very limited in quantity, and will have to be taken over on very radical competition and no doubt at radically lower figures.

"So far, on investigation, I find that it will seemingly be impossible for us to ever secure any of the business of the large transportation companies, and we might as well conclude that that will continue to be the condition. In our last efforts to secure a portion of that business, our bid on the opening of the bids, we think was the lowest, still, the business was given to a competitor, who afterwards, I judge, was favored with a further opportunity.

"The radical change in the market situation in the last 60 and 90 days calls for your earnest consideration as to future operations, and ways and means found for disposing of our oil. Our financial situation requires immediate attention.

"Our lessor, under our lease, requires us to keep up a constant production and also drilling. It is hardly possible that we can get any relief in that direction from the lessor. There is plenty of oil within our territory, but it's only subject to our ownership for a limited period of time. After the expiration of the lease, what is left, belongs to the owner of the land. Hence, it behooves us within our time to dispose of as much of it as possible. There being, seemingly, an unlimited quantity, at least for the period of our lease, it becomes good policy that we dwell not on the question of price per barrel, but more to the point as to how many dollars we can create during the period of our lease, by doing a larger volume of business. Hence, so long as there are consumers to supply, it behooves us to supply them at as near the price offered by others as it may be possible for us to obtain. Therefore, whatever will lead to a sale of the greatest quantity of oil, at a price that will yield a profit, is all that the future has in store for us.

"Six months ago the market conditions were such that we anticipated that a loan of $100,000.00, for one year, would accomplish all these results and secure to us a proper pipe line and pumping plant, but under the present conditions of the market, if we continue the expenditures planned, in addition to those we are compelled to conduct, under the terms of our lease, it will require a much larger period of time to get rid of the floating debt.

"You will note that the possible receipts under the contracts today will approximate gross at the wells $108,000.00 for 1905. A fair starter has been made on business for 1906, but that will not be any relief to our present requirements. To do the work under our lease and protect our rights, to prove territory, to produce and to make the necessary betterments, exclusive of pipe line investment, will consume our probable receipts for the year. The probability of increasing receipts other than nominal amounts, on spot orders, looks very questionable. Our requirements on pipe line and tankage, in addition to what has been expended, will amount to about $40,000.00.

"At the present time we have a market for less than half of the *present* production.

"If we can finance our present requirements we must look to volume of business for our profits in the future rather than to price per barrel. The title in fee in this territory, does not belong to us, and we have no interest in the remainder after the term of our lease expires."

To complete this sketch outline of the salient facts, it may here be added that at the time this letter and report were sent out the Amalgamated company had been organized, the defendants Bamberger, Wood, and Price, turning in all of their stock in the Salt Lake Oil Company and their ownership of two adjoining companies, the Arcturus Oil Company and the Utah-California Consolidated Oil Company, corporations owned by these defendants and controlling lands near by or adjacent to the Salt Lake Oil Company. In these latter companies plaintiff was not interested. Plaintiff sold his stock for two dollars a share, a price which, by all of the testimony, was more than its value. Thereafter the stock of the Amalgamated Oil Company became of great value. If it had not increased in value undoubtedly this litigation would not have been prosecuted. Because of that increase in value and of the nature of these transactions, plaintiff's position is that there was such a fiduciary relationship between the directors (who also owned a majority of the stock) as to make it their duty to disclose to the minority stockholders the terms and conditions upon which they were parting with their stock, and also to give these minority stockholders the option to take shares in the Amalgamated Oil Company upon the same terms as those which were accepted by the defendants. The con-

cealment of the "Amalgamated deal," coupled with the duty
resting upon the defendants to disclose to the fullest degree
the nature of this deal, is thus made the head and front of
their offending. Other charges going to deliberate misrepre-
sentations were made against the defendants, but they were
unsupported and were abandoned at the trial, and are not
here pressed upon the consideration of the court.

The case is rather exceptional in one respect. All of the
evidence upon the controverted matters is either record evi-
dence contained in letters and reports, or is evidence from
the lips of the defendants themselves, and in all of their evi-
dence they earnestly insist that every word which they put
forth and every representation which they made were true.
Not only do they deny any design or attempt to put a fraud
upon the minority stockholders, but they insist that by the
sacrifice of their own interests they protected the interests of
the minority stockholders and enabled them to sell their stock
upon terms which they, the defendants, would have been glad
to receive for their own stock, and which they were unable to
receive.

So much in outline, it remaining only to be said that the
findings of the court were wholly against the plaintiff upon
all the controverted matters and equally comprehensive upon
the question of the good faith and fair dealing of the defend-
ants. Following the judgment, plaintiff moved for a new
trial, which was denied, and his appeal is addressed to the
insufficiency of the evidence to sustain certain material find-
ings of the court.

At the outset of this consideration and for the clarifying of
the discussion, it should be said that there is no conflict in the
evidence upon any vital matter, and that the evidence is
wholly in favor of defendants. It has been said, also, that
the trial court found in accordance with this evidence. Ap-
pellant concedes this, and declares in his brief that "It is not
a question, however, of conflicting evidence in the ordinary
sense. The only dispute here is as to the inference to be
drawn from the probative facts. . . . It thus results that the
only questions to be considered by this court are as to ulti-
mate facts, that is, whether actionable fraud can be inferred
from the admitted facts, and to what extent plaintiff was
thereby damaged by defendants." And finally, appellant
says, and in this is found an erroneous position upon which

he greatly relies throughout his brief: "This court has always held that an appellate court has the right of drawing its own inferences from admitted probative facts in such cases, unimpeded by the conclusions of the trial court, where all the evidence is brought up on an appeal from an order denying a motion for a new trial. That is, it is as if such questions of construction were questions of law, and this court may pass upon them with as unimpeded a judgment as if they were being passed upon in the first instance."

Herein lies a great error, which affects the whole of appellant's argument. This court has not, never has declared that it has, and has never exercised under its power of review, such a power of original determination of facts. For this court to do so would be for this court to make findings of fact. No case which appellant cites in the slightest supports his position upon this matter. They are, without detailed review of them, simply cases announcing the familiar principle, that when a general finding of fact is drawn *by the trial court* as a conclusion of fact, from special findings of fact, also drawn by the trial court, if these special findings of fact are inconsistent with the general findings, the special findings will control. An inference is but a reasonable deduction and conclusion from facts proven, which court or jury is entitled to draw. (Civ. Code, secs. 1958, 1960; *Davis* v. *Hearst*, 160 Cal. 143, 176, [116 Pac. 530].) If the finding of fact is based upon a reasonable inference, it is not within the power of this court to set it aside any more than it is within its power to set aside any other finding supported by sufficient legal evidence. For a finding of fact based upon reasonable inference drawn from facts proved with legal sufficiency is as much and as completely as is any other finding of fact a finding based upon good and sufficient evidence. It is the peculiar and exclusive province of trial court or trial jury in the first instance to make such finding of fact, and it is the especial right of every litigant to have all facts so determined by court or jury, this court sitting only to review the findings and being empowered to set them aside as matter of law only when not sustained by adequate evidence. So, when appellant states that the only question to be considered is "whether actionable fraud can be inferred from the admitted facts," it is a surrender of his case. For, if there be two inferences equally reasonable and equally susceptible of being drawn

from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of court or jury to draw the inference favorable to fair dealing. (*Levy* v. *Scott,* 115 Cal. 41, [46 Pac. 892] ; *Thomas* v. *Visalia Electric Co.,* 169 Cal. 658, [147 Pac. 972] ; *Casey* v. *Leggett,* 125 Cal. 664, [59 Pac. 264] ; note to *Burch* v. *Smith* (Tex.), 65 Am. Dec. 154.) For fraud must always be proved, so that when the plaintiff's case goes no further than to establish a state of facts from which the inference of fraud may or may not be reasonably drawn, he has failed to establish his charge by a preponderance of the evidence, and it becomes the duty of court or jury, as has been said, to find in favor of innocence and uprightness. This does not, of course, mean that the fraud must be proved by direct evidence. This is not always nor even often possible, but it does mean that the indirect evidence and the inference to be drawn from the proved facts must be so convincing as to satisfy trial court or trial jury that fraud was designed and accomplished. If, therefore, we should accept appellant's statement as above quoted, that the sole proposition is whether fraud *can* be inferred from the admitted facts, the complete answer is that, conceding that fraud might be inferred, the trial court upon substantial evidence has declined to infer it, and its action in so doing is not here open to question.

What appellant means, however, doubtless, is that the question is not whether actionable fraud *can be* inferred, but whether it *must be* inferred from the admitted facts, and to the consideration of the evidence from this point of view we thus come.

That evidence shows that Price, Wood, and J. E. Bamberger had become greatly discouraged over the future prospects of the Salt Lake Oil Company which they managed and controlled. They considered themselves in a precarious position from which they were anxious to be relieved, profitably, if possible. In particular, their discouragement lay in the facts that they were obliged at an expense estimated at twenty thousand dollars a month to continue their development work under their lease, and that when a well developed oil they could not sell it. Contracts covering the oil consumption of the southern part of the state were already let for periods of one, two, and three years. To store their oil involved additional expense. The Associated Oil Company was a great

and wealthy producer and competitor. They endeavored to interest the Associated Oil Company through its manager, Porter. They wished Porter to buy the Salt Lake Oil Company lease and properties for a million and a half dollars. They desired also to have Porter buy the Arcturus company, which they owned, and which was capitalized for five hundred thousand dollars in shares of the par value of one dollar each. The Arcturus Oil Company had brought in a well which proved up as oil land about 160 acres of the Salt Lake Oil Company's leasehold and about 80 acres of its own leasehold. They also owned the Utah-California Consolidated Oil Company, which held neighboring lands under leases but had not as yet produced any oil. All these properties they desired to sell. Porter, representing the Associated Oil Company, was willing to negotiate with them but not at all along the lines which the defendants desired. Porter was not willing to buy at all either stock or properties. He would not even buy the majority holdings of these defendants. He was willing to effect an arrangement whereby they should sell to him one-half of their holdings, these defendants retaining the other half, pooling their issues and thus controlling these three oil companies. They desired Porter to buy the Salt Lake Oil Company at a million and a half of dollars, or three dollars per share, and he laughed at them. They asked a dollar and a half a share for their five hundred thousand shares of Arcturus stock and again he laughed at them. To reach a basis of understanding it was agreed that they would consider the Salt Lake stock as worth two dollars a share, although Porter always insisted that this was more than it was worth. Porter's idea was to control the three companies. He considered the Arcturus to be worth one dollar a share, but would not deal with them upon that basis if the Salt Lake stock was to be considered as worth two dollars a share. However, he would treat the field as a whole, and did not care whether they put fifty cents on one and a dollar on the other, so that the total price for the whole field would not exceed the sum at which he valued it. Finally, under the insistence of the defendants, against the protest of Porter and other directors of the Associated that Salt Lake was worth no such price, a basis was agreed upon of two dollars for Salt Lake stock and fifty cents for Arcturus stock and eight thousand

dollars for the stock of the Utah-California Consolidated Oil Company, but this price was to be only the basis of negotiations and was to be considered with reference solely to the defendants' holdings. Porter did not want any of the minority stock and would not agree to buy any part of it at any price. The defendants insisted that they could not go on with the negotiations unless the minority stockholders were given the option to sell at the same price of two dollars a share. Porter said they carried too much sentiment into business and refused to consent. The defendants then endeavored to dispose of the Salt Lake Oil Company's property for a million and a half dollars to the Southern Pacific Railroad, but nothing came of it. On October 13th, Porter formulated his proposition on behalf of the Associated Oil Company, which he represented, which was the organization of a holding company to be known as the Amalgamated Oil Company. This proposition contemplated the purchase by the Associated Oil Company of one-half of the controlling stock in these three corporations owned by the defendants. A new corporation was to be organized, capitalized at five million dollars, divided into fifty thousand shares. To this new corporation the Associated Oil Company and the defendants were to convey their stock in the three oil companies, receiving in return in equal proportions stock in the Amalgamated Oil Company. This stock, in turn, was to be pooled, with the control in the Associated Oil Company. In this not the slightest provision was made for the taking over of the stock of the minority stockholders, and the defendants absolutely refused to negotiate upon the terms of this written offer, insisting that the minority stockholders should be given the right to sell their stock if they so desired to the new company which it was proposed to be formed, at the rate of two dollars a share. Porter replied that two dollars a share was more than anyone would value the stock at, and that the only reason that he consented to that valuation so far as the defendants were concerned was on account of the peculiar situation and the fact that the transaction when completed would take in the other companies. The meeting dissolved by Price telling Porter to go ahead and form his holding company, they would proceed step by step, and if they found that finally they could not agree, Price and his associates would take the holding company off Porter's hands. In this last declaration appellant

finds evidence of fraudulent design in the expression of the willingness of these defendants to take this holding company out of the hands of the incorporators in case they could not come to a satisfactory business arrangement, but manifestly the holding company without any property whatsoever would have no value greater than the cost of preparing and filing the articles of incorporation, and the plain import of defendant's language was simply this, that as they controlled these three oil companies, and as a holding company might be a convenient means of consolidating and prosecuting the business of the three, if an agreement between them and the Associated Oil Company could not be reached, they would take over to themselves this propertyless corporation to be known as the Amalgamated and use it for the convenient transaction of their own business if it should seem desirable so to do.

The negotiations proceeded, the Amalgamated company was formed with Price, Bamberger, Wood, Chanslor, and Porter as the incorporators. It held its organization meeting in Los Angeles on October 27, 1904, Porter and Canfield (a director of Associated), both declaring that the stock of the Salt Lake Oil Company was not worth two dollars a share, finally agreed to the arrangement whereby the stockholders were given an opportunity to sell it to the newly organized Amalgamated Oil Company for two dollars a share. In other respects the agreement above outlined was, generally speaking, carried out saving that the defendants received, and, indeed, were obliged to take, seventy-one cents cash for their Salt Lake oil stock. The remainder of the purchase price upon the basis of two dollars a share they took in stock of the Amalgamated Oil Company. The uncontradicted testimony is that, so far as they themselves were concerned, they entered into this arrangement with reluctance, and would have been glad to sell all of their pooled stock for one dollar and fifty cents per share cash, but that the only terms which they could arrange were terms binding them against their wishes to retain this stock interest in the new corporation. Touching the value of the Salt Lake stock outside of this evidence, it is shown that defendant Price had purchased fifty thousand shares at forty cents a share and had taken an option on twenty-five thousand additional shares at seventy-five cents a share. Defendant Phillips owned fifty-two thousand five hundred shares, two thousand five hundred shares of which he had purchased in November, 1903, at sixty cents a share. In

February, 1904, he sold fifty thousand shares for eighty cents a share and sold his remaining two thousand five hundred shares at two dollars per share cash. It therefore appears that this conspirator, with full knowledge of all the transactions, sold at the exact price which plaintiff received for his stock. In addition to this, such of the minority stockholders as were friends and relatives of the defendants, Bamberger's son and brother and Wood's stepson, sold in like manner, and, as has been said, the testimony is that the defendants themselves would have been glad to have sold out all of their holdings for a less price than that which they had secured for the minority stockholders.

Thus are presented such evidentiary matters as are necessary to this consideration. As has been said, all findings of the court were in favor of the integrity and fair dealing of the defendants and those findings in every respect which we have considered are abundantly sustained. There is left to appellant but one proposition which itself has heretofore been outlined. Appellant's contention is that there was such a relation of trust and confidence existing between the defendants and himself as to impose upon them the imperative duty to disclose, as their letter and report did not disclose, the full and complete nature of their proposed transactions with the Amalgamated, to the end that with this information before him plaintiff might determine whether or not he would sell his stock, and it is said that this duty of disclosure resting with defendants, their failure to disclose amounts to fraudulent concealment.

That the last proposition is sound in equity is, of course, true. Where there is a duty to disclose the failure to disclose is concealment. But the findings of the court are that the letter and report fairly and fully stated the conditions at the time it was circulated; that the defendants did not conceal their arrangement with the Associated Oil; that no especial relationship of confidence or trust existed between defendants and plaintiff, and that plaintiff did not specifically rely upon any such relationship; that no such relationship of trust existed other than that growing out of the position of these defendants as directors and officers of the Salt Lake company, and that, as such directors and officers, they did not fail in any duty cast upon them by law or equity.

So far as concerns the charge of concealment, this fact is unquestioned. There never was anything to prevent Bam-

berger and his associates from selling to Porter all or one-half of their pooled stock at any time and thus leave the minority stockholders to be handled by the buyers in any way they saw fit. There is equally no doubt but that a perfectly legitimate step, considering the bad financial condition of the Salt Lake company, would have been an assessment upon its stock. It needs no gift of prophesy to foresee what would have been the result of such an assessment. It could easily have been borne by the Amalgamated Oil Company with the backing of the Associated Oil Company and by these defendants, whose financial responsibility was unquestioned and who already had advanced large sums to the Salt Lake company. It is perfectly clear that if there had been any design to take an unfair advantage of the minority stockholders and to acquire their stock for little or nothing, the method adopted would have been the "freeze out" by assessment. The history of the Salt Lake company after its control went into the Amalgamated shows that it was a heavy borrower to the extent of one hundred and fifty thousand dollars from the Associated Oil Company. Can it be doubted but that if this minority stock was outstanding, assessments, perfectly legitimate in law, would have been levied? The utmost that could be foretold from the Amalgamated deal was that probably through the Amalgamated's connection with the Associated Oil, the Amalgamated would have contracts for supplying oil and that the Salt Lake Oil Company would find an added market for its product through the Amalgamated, but this did not mean that the Salt Lake Oil Company in the depressed condition of the market would make a profit upon the oil. All the time, under its contract of lease, it was obliged to continue drilling for oil, so that there was reason to believe that even marketing the increased product (better as that would be than having that product on hand), the market price would entail loss. It is to be remembered that Bamberger and his associates had not the power to extend to the minority stockholders the option to take Amalgamated stock in lieu of their own. The Associated Oil people never contemplated this, and the testimony shows that they did contemplate that once having control of the Salt Lake company they would squeeze out, by legitimate methods, the minority stockholders. Certainly they were not interested in the welfare of the minority holders.

How, then, may the situation be summed up? Bamberger and his associates proposed to sell their controlling stock as they had the right to do without conference with or the knowledge of the minority stockholders. The report which they presented to the stockholders was full, fair, and correct. It made no mention of the terms of their sale other than that it was on the basis of two dollars per share, as in fact it was. It was not incumbent upon them to declare the terms of their sale, and the minority stockholders could not have availed themselves of like terms even had they desired so to do. No trust obligation resting upon the defendants imposed upon them the duty either of securing the same terms to their minority stockholders or of disclosing to the minority stockholders what those terms were. Had Bamberger and his associates been guilty of the evil designs with which they are charged, a simple and direct method of accomplishing them quite within the law was before them. They needed but to assess the stock. And, finally, upon this matter it deserves mention that the great value which subsequently accrued to the Amalgamated stock (not to the Salt Lake stock) came largely from the fact that an oil gusher of enormous productivity was developed upon the land of the Arcturus company, in which this appellant had no interest. From what has been said it is manifest that, first, as stockholders the defendants had a perfect right to dispose of their stock (which was all that they did) without the slightest regard to the wishes and desires or knowledge of the minority stockholders; and, second, that as directors they concealed nothing which plaintiff was entitled to know or which would have been of value to him if he had known. It is unnecessary, therefore, to consider or analyze at length such cases as *Strong* v. *Repide,* 213 U. S. 419, [53 L. Ed. 853, 29 Sup. Ct. Rep. 521], where appellant absolutely controlling a corporation owning friar lands in the Philippines and carrying on the negotiations with the United States government for the purchase of those lands, he alone having the power to effectuate the sale and he alone knowing upon what terms he would effectuate the sale, secretly and through intermediaries purchased the minority stock without disclosure and at a price far below its value. And as little need is there for considering the line of authority which may be thought to be in opposition to this and which is sufficiently indicated by the following from 4 Thompson on Corporations, second edition,

paragraph 4031, where he says: "Though there is a conflict in the decisions as to the right of directors and officers to purchase the shares of other stockholders, it is believed that the weight of authority sustains the right of these persons to deal in shares of the corporation where the transaction is free from fraud. The officers are not bound to acquaint a stockholder willing to sell his stock with facts which would enhance the price of the stock. The officers are trustees for the stockholders only as to the management of the corporation and not in their private dealings."

It is unnecessary, we repeat, to do this, for by the history of the transactions as developed by the evidence and found by the court, it is clear that defendants acted with unimpeachable good faith.

The order appealed from is therefore affirmed.

Melvin, J., Lorigan, J., Shaw, J., Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.