[Civ. No. 3979. Third Appellate District.—January 27, 1930.]

GEORGE DALICE GATER et al., Respondents, v. C. H. SKINNER et al., Appellants.

W. I. Gilbert and Chas. L. Nichols for Appellants.

Charles H. Sherrick and G. C. Dodson for Respondents.

BURROUGHS, J., *pro tem.*—This is an action to rescind a contract for the purchase of real property on the ground of fraud in its procurement and to recover the sum of $1250 paid thereon. Judgment as prayed for was rendered in favor of the plaintiff. The defendant John P. Mills Organization, Inc., a corporation, hereinafter called the Mills Company and the defendants Skinner and Holladay have appealed. The defendant Watts was served with process but failed to appear therein and the remaining defendant, Norman A. Foster, was not served with process nor did he appear in the action. At the close of plaintiff's evidence the defendants made a motion for a nonsuit, which was denied. Defendants failed to offer any evidence and the court made its findings of fact and conclusions of law and the judgment complained of was thereupon entered.

The evidence discloses that the Mills Company was at all the times mentioned in the complaint the owner of lots 44 and 45 of block 3 of the Wardlow-Manor tract in the county of Los Angeles and was engaged in the business of selling real estate. It had a main and branch office in the city of Long Beach. The branch office was conducted by the defendants Skinner, Watts & Holladay, but both offices carried in large letters signs announcing that they were offices of the Mills Company. The defendant Foster was a licensed real estate agent working with the office of Skinner, Watts & Holladay and at times working with the office of the Mills Company. According to the testimony of the defendant Skinner, his firm was the selling agent of the Mills Company.

On June 23, 1923, defendant Foster called upon the plaintiffs and discussed with them the advantages that would accrue to them by investing in the lots above discribed. Plaintiff George D. Gater testified that Foster told them the tract had just been opened up and was about sold out. He had purchased three of the lots himself and would have taken more had he been able to do so. The tract had proved so good with oil that the United States geologists had made a survey and analyzed it and said they had located a pool of oil directly under the tract. Foster also told them it was going to be opened up as an oil-field right

away. He further stated that ninety per cent of the lots had been sold to Mills salesmen. He then told about the oil on Signal Hill and the people there who owned lots whose income was running, some of them, eight or nine hundred dollars a month. He said the geologists claimed there was a better lake of oil under the land he was trying to sell them than there was under Signal Hill, that there was a strata or line running through there from Signal Hill to the Torrance Field and there was a main lake right under this tract of land and it would be far better than Signal Hill. The witness continued substantially as follows: He wanted to know when I could go over there and see the land. I went over with him the next morning and he took us pretty well over toward Wilmington and around where some big oil tanks were being constructed and he said the production was going to be so great that they had to be built in order to take care of the oil. I told him the road was so rough I would not buy in there. He replied that they were going to build up the streets and this would be one of the main thoroughfares through the tract. He said I would treble my money on them in three months. He said the lots were only valuable for oil. They had a tent on one corner of the property and I asked what it was for. He said it was used for serving meals when they had people out there to listen to their speeches and to buy lots. He said he was working for the Mills Company. He told us he had a standing offer to lease all these lots for twenty-five dollars per month for each lot and also had a reliable party figuring on renting them for fifty dollars per month for each lot, and if we bought they did not want us to lease, wanted it to go through their hands because the more lots they got together we could get bigger monthly payments. He said after the oil came in we would get one-sixth of the royalty of the body of oil that was under the tract; it wouldn't be no time until there would be a regular chain of derricks there that would beat anything on Signal Hill.

The witness further testified that on different occasions he asked Foster to lease the lots for him and told him to take twenty-five dollars per month per lot, but that he never did it; that he went to the main office of the Mills Company about May, 1924, and talked with a Mr. Miner, who seemed to be the main man in charge of the office and demanded his

money back and offered to give them a quitclaim deed to the lots. The witness further stated that he would not have bought the lots but for the statement that they had located oil under that tract and that it was a big lake. The contract of purchase of the property was signed by the Mills Company as the seller. All payments thereon made by plaintiffs were made to the Mills Company by check and the checks were returned to plaintiffs indorsed by said company. On May 1, 1924, some correspondence took place over a credit claimed by the plaintiffs as a payment on these lots. In reply thereto the Mills Company wrote a letter in which they stated: "You will note that we have given you credit of $50 on your final payment of your Wardlow-Manor property."

The testimony of Mrs. Gater, the other plaintiff is in large measure corroborative of the testimony of her husband. In addition thereto she testified that the day following the trip to the land about which her husband told, Foster visited her home and said to her: " 'Did you hear the good news?' I said, 'What's that?' He said, 'That big well came in last night. I went back over there at 12 o'clock and it gushed up over everything and I got it all over my shoes and on my clothes—a big gusher came in.' He said, 'That opens up the field now and there is only three lots left, and you have got to take them this morning, if you want any, because they will be gone by night.' So I told him Mr. Gater didn't want them; and I said, 'We haven't got much money anyway.' He said, 'We'll arrange that.' " Foster took Mrs. Gater up to the John Mills offices where they saw Holladay. The witness continued: "He (Holladay) said, 'Well, this is one of the best (buys). . . . That big gusher came in. It opens up that field over there now.' That big gusher looked to be a mile away; he didn't say how far it was; but I could see it when we were there—Mr. Foster pointed out the derrick to us. I wrote him a check for twenty-five dollars. . . . The check was given, I think, about the 29th of June, 1923. On that same day, Mr. Foster took me down to the main office (of the Mills Company) after I got through with Mr. Holladay, to a lady there and swore me—they told me I had purchased some lots, and they got me to sign a paper, but I don't know what it was, now. I think Mr. Foster called it

a sales slip.'' The witness testified she signed the long contract about three 'months later. She said: ''I believed every word of what Mr. Foster said about the leasing of the lots for twenty-five dollars each, and the United States geological survey and the pool of oil and that they were going to put a road in front of the lots. I certainly relied upon it. I wouldn't have paid anything for the lots if it hadn't been for that. Neither Mr. Foster nor the Mills Organization have ever leased these lots for twenty-five dollars each per month nor for fifty dollars each per month, to my knowledge. I did demand that they do lease them. To my knowledge, there has been no drilling on that tract of land by the Mills Organization nor anyone else. The money we paid for these lots was demanded back from the Mills Organization. We did offer to give a quitclaim deed to the Mills Organization for them. In December, 1923, we knew the derrick (near the land) had been torn down and then we asked him to give us our money back.'' She further testified in effect as follows: ''Foster pretended to know the oil business. When I went to the office and talked with Mr. Holladay there was a big sign there. It read, 'John P. Mills Organization.' I did not see the sign 'Skinner, Watts & Holladay.' Mr. Holladay said it was the Mills Organization. My husband was opposed to this purchase until the big gusher came in. It was on a line with Signal Hill and nearer this land than Signal Hill. I only heard read the front page of the agreement. Mr. Foster read it. He said he had read the important parts of it. This was at night and he was in a hurry.''

Wells A. Rathbun, an officer of the Mills Company, testified he did not know whether Foster was with the Mills Company in August, 1923. He stated that their method of operating was such, ''even though he were working in our office, he might have a desk there, yet he wouldn't be working for us.'' Defendant C. H. Skinner testified that Foster was a selling agent for Skinner, Watts & Holladay and that the latter firm were the selling agents for the Mills Company and that neither Mills nor his organization ever gave them a right to make any statements claimed by the plaintiffs to have been made by Foster.

Appellants claim that the first two alleged false representations are mere expressions of opinion, the first

one being that "said property had great value as oil land" and the other "that respondents would make large oil royalties from said lots."

Standing alone, such statements might bear such a construction, but when coupled with the evidence of Foster to the effect that the United States geologists had made a survey of the land and had located a large pool of oil under the tract and that when the lease was made and the pump in operation the plaintiffs would receive a one-sixth royalty of the oil produced from the tract they go further than mere expressions of opinion and were undoubtedly intended to and did deceive the plaintiffs.

■ It is the next claim of error that the statements made to the plaintiffs that defendants had a standing offer to lease the lots for twenty-five dollars per month for each lot; that streets would be put in and graded and that drilling operations would be started immediately were mere promises with reference to the future and failure to perform them does not constitute actionable fraud. Taken in connection with the other evidence it is clear that such statements were merely a part of the general scheme to defraud the plaintiffs.

■ Appellants next claim that there is not a scintilla of testimony in this case that the statements that defendants had a standing offer to lease each lot for twenty-five dollars or that United States geologists had examined said property and there was a large pool of oil under said tract and under respondents' lots or that ninety per cent of the lots had been sold to the Mills employees were or are false. Eliminating from consideration the last claim concerning the purchase of the lots by the Mills employees, we will consider the statement that defendants had a standing offer to lease the lots for twenty-five dollars each per month. Plaintiffs on many occasions asked Foster to go ahead and make the lease and were each time put off. Once he asked that any consideration of the offer of fifty dollars per month be abandoned and accept the standing offer of twenty-five dollars per month. Notwithstanding this request, months elapsed, in fact the trial of this action was had nearly four years after such promises were made and yet no leases were ever entered into. It is obvious that only one inference can be drawn from this situation and that is that the promise was a material statement made without any intention to

perform and under the evidence of both the plaintiffs was one of the moving causes that led them to enter the agreement.

■ It is also claimed that there is no evidence that the United States geological survey did not examine the property and make the report that there was a pool of oil under the land. This contention might be sound were it not that Foster stated that by virtue of a certain well on other property having brought in oil had thereby proved the assertion of the said geologists that there was a pool of oil under the lots. Further, Foster himself stated that there was a pool of oil under this land.

In *Phelps* v. *Grady,* 168 Cal. 73, 77 [141 Pac. 926, 927], it is said: "True of course it is, that expressions of opinion honestly made are not actionable. Equity has no concern with them. But equally true it is that a false statement of an opinion expressed to one entitled to rely upon it may form the basis of an action for deceit, like any other misrepresentation of fact." (*Crandall* v. *Parks,* 152 Cal. 772 [93 Pac. 1018]; *Herdan* v. *Hanson,* 182 Cal. 538 [189 Pac. 440, 444].)

■ Counsel's contention that fraud must be proved and that there is no presumption of fraud and plaintiffs have failed to prove fraud, states a well-recognized rule of law, but this does not mean that the evidence must be direct. In *Herdan* v. *Hanson, supra,* it is held, "While fraud must be clearly proved, direct evidence is not necessary for this purpose, but the 'indirect evidence and the inference to be drawn from the proved facts must be so convincing as to satisfy trial court and trial jury that fraud was designed and accomplished.'" (*Ryder* v. *Bamberger,* 172 Cal. 791 [158 Pac. 753].)

■ From the foregoing we are satisfied that such representations when made with intent to deceive and defraud, whether considered as expressions of opinion or as a statement of fact, constitute fraud and were the inducing cause of the plaintiffs entering into the agreement in the instant case. Furthermore, the question was one for the court and has been decided adversely to appellants. (*Davis* v. *Monte,* 81 Cal. App. 164 [253 Pac. 352].) ■ It is also claimed by appellants that there is no evidence that any of the statements were false. The evidence shows that in 1923 the defendant Foster told plaintiffs that he would lease their lots

for them at twenty-five dollars per lot; that they were going to drill for oil at once; that the plaintiffs were to receive a one-sixth royalty from the sale of all oil pumped from the tract; that the land had actually been brought in as oil land and that there was a pool of oil under the land. The trial of this action took place in March, 1927, nearly four years after the statements were made and yet the record discloses that none of these promises had been performed at that time. It is very apparent that the promises were made without any intent to perform, particularly in view of the fact that the only derrick near the property had been removed.

It is further claimed that no agency has been established between Foster and his co-defendants. The facts are that the Mills Company owned the property; according to defendant Skinner his firm had the property listed and Foster was selling through his office. The contract was made in the name of the Mills Company, and in their office, they received all payments, adjusted a difference between the plaintiffs and themselves over a payment; they also paid Skinner and his partners their commission on the deal and thereby held themselves out as a party in interest. We, therefore, believe that they are sufficiently connected with their co-defendant Foster and should not be released from liability.

Many other points are made for a reversal, but no useful purpose would be served by setting them forth in detail. We have examined each one and hold they are without merit.

The judgment is affirmed.

Finch, P. J., and Plummer, J., concurred.