[Civ. No. 13645.   Second Dist., Div. One.   Jan. 8, 1943.]

WELBURN MAYOCK et al., Respondents, v. MINNIE E. SPLANE, an Incompetent Person, etc., Appellant.

Cantillon & Glover and Warner Praul for Appellant.

Welburn Mayock and Charles T. Lester, in pro. per., for Respondents.

YORK, P. J.—This is an action to recover the sum of $53,822.50 alleged to be the reasonable value for legal services rendered by respondents to appellant during the period from March 3, 1939 to September 26, 1941, together with the sum of $2,119.73, an alleged balance due on account of expenses and funds advanced by respondents in connection with the performance of said legal services.

Appellant, by her corporate guardian, denied liability for lack of information or belief and pleaded the statute of limitations as a bar to the action. The matter was brought to trial and on December 8, 1941, respondents rested their case, guardian's motion to file an amended answer and counterclaim on behalf of appellant was granted, and trial was continued. The said amended answer admitted the employment of respondents from March 3, 1939 to May 1, 1941, and among other things alleged upon information and belief that respondents at the time they accepted such employment had knowledge: (1) that appellant was an elderly widow aged 71 years and was the owner of a fortune in excess of $500,000; (2) that Flora M. Schultz was then and had been for some months an intimate friend of appellant, who had the utmost faith, trust and confidence in Mrs. Schultz; (3) that appellant was then mentally incompetent by reason of

old age, or weakness of mind, and unable to manage her property properly and was likely to be, and had been, deceived and imposed upon by artful and designing persons; (4) that said Mrs. Schultz had obtained from appellant the sum of $45,000 by means of a written agreement relating to a gold mining transaction, which agreement respondents had prepared while acting as attorneys for said Schultz, and that Mrs. Schultz had been convicted of a felony arising out of gold mining operations and had served a term of imprisonment therefor some years prior.

Said amended answer upon information and belief recited a course of unfair dealing on the part of respondents resulting in the alleged enrichment of their clients and the financial loss and detriment to appellant in the sum of $56,042.23.

From the judgment awarding respondents the sum of $25,000 for legal services and $2,119.73 for money advanced for expenses, this appeal is prosecuted on the following grounds:

"I. The findings of the trial court to the effect that respondents performed services as attorneys for appellant under conditions entitling them to a fee of $25,000, or to any fee at all, are wholly unsupported by the evidence.

"II. The award of $25,000, as attorneys' fees is excessive."

██ The finding particularly referred to by appellant as being unsupported by the evidence is the following:

"XVIII. That it is untrue that plaintiffs engaged in any unfair dealings with defendant as her attorneys or otherwise; that it is untrue that the acts of plaintiffs were in any respect inconsistent with their duty as her attorneys, or inconsistent with the character of the legal profession; that it is untrue that plaintiffs were guilty of any neglect in their duty or conduct toward defendant; that it is untrue that plaintiffs' conduct resulted in the enrichment of one of plaintiffs' clients to the financial loss of defendant; that it is untrue that plaintiffs acted without and in excess of their authority in dealing with the affairs of defendant; that it is untrue that defendant has been damaged in the sum of $56,042.23 or any less or greater sum or at all by reason of any neglect or acts or omissions of plaintiffs; that it is untrue that plaintiffs failed to faithfully discharge their duties to defendant; that it is untrue that the services of plaintiffs for and on behalf of defendant were of no benefit

and wholly worthless, but on the contrary it is true that said plaintiffs' services for and on behalf of defendant were diligent, faithful and efficient, and were of the reasonable value of $25,000.00; that it is untrue that defendant has been damaged in the sum of $40,000.00, or any other sum by reason of any neglect or misconduct of plaintiffs.''

Respondents presented and filed their bill of particulars pursuant to a demand made upon them by the attorneys for the guardian of appellant. Said bill itemizes the time spent by respondents in the performance of legal services rendered to appellant in connection with the various matters which were in course of litigation during the period in question.

For the purpose of brevity, and for a better understanding of the instant action, the following recital of facts is taken from defendant's Exhibit B, a letter written in explanation of said bill of particulars by one of respondents to Mr. Hubert C. Morrow, who was called as an expert witness during the trial herein:

The principal services for which respondents seek compensation arose out of incompetency proceedings directed against appellant by her son Howard Splane, assisted by her daughter, Myra Galbraith, both of whom reside in the East. It appears that appellant, who is about 74 years of age, owns property in California and in Pennsylvania, the California property consisting mainly of the Walker home in Laurel Canyon for which she paid $60,000, furnishing it at a cost of $25,000, and against which there exists an encumbrance of $22,000. The Pennsylvania property consists of stocks and bonds with an estimated value of $700,000, encumbered in the amount of $138,000.

Previous to the time she employed respondents, appellant had become interested in, and had given large sums of money to, the Messianic World Message, an organization dedicated to spreading the religious and philosophical teachings of one of its leaders; and had built for said organization a home in Hollywood and a temple and recreational center in the San Bernardino Mountains which she dedicated to the memory of her husband and her son, the latter of whom was an aviator in World War I and died in service. These gifts were made over a period of years and principally from income.

Appellant later met a Mrs. Stafford, who was furthering

the Mothers' Peace Movement, to which organization appellant made a voluntary contribution, paying $25,000 as a down payment on the purchase price of the Laurel Canyon property, as well as $25,000 for the furnishings. Mrs. Stafford then contacted Mrs. Flora M. Schultz, who had a gold mine to finance, and induced appellant to underwrite the financing thereof to an amount approximating $100,000, it apparently being Mrs. Stafford's idea that the income from the mine should constitute an endowment for the Peace Movement; appellant being led to believe that other wealthy women were contributing commensurate sums of money to the project. However, Mrs. Schultz quickly saw that Mrs. Stafford was not sincere and proceeded to ingratiate herself with appellant to the extent that she supplanted Mrs. Stafford and then revealed to appellant what Mrs. Stafford had been doing. It appears that respondent Mayock had represented Mrs. Schultz some years previous to this time, and in the spring of 1939 she introduced respondents to appellant, who employed them to investigate the Stafford transaction. Respondents discovered that Mrs. Stafford, instead of taking title to the Laurel Canyon property in the name of the Peace Movement, which was a non-profit corporation, had taken title in her own name, using her name by a former marriage and one which she was not then using. The contracts for the furniture were made out to her personally and instead of utilizing all the money provided for the full payment of the furniture, she paid substantial sums down and executed conditional sales contracts for the balance. The purchase price trust deed with a balance of $39,999 owing was in default and foreclosure was being threatened. Respondents secured a bill of sale from Mrs. Stafford for her interest in the furniture (which she later repudiated), and thereafter brought suit against her to quiet title to the furniture prosecuting the same successfully. Meantime, a number of mechanics' liens had been filed for improvement work on the Laurel Canyon property, and after several months that property was foreclosed in favor of Mrs. Maple, the former owner, who entered into a contract with appellant thereby crediting appellant with all the payments she had made under the deal. Respondents then investigated the Messianic World Message, terminated the flow of funds thereto and convinced appellant that her charities should be less lavish and should

be confined to her surplus income, and not taken from her capital. During this time appellant was also represented by other attorneys on transactions with which respondents were not consulted. "As a matter of fact," quoting from the letter written to Mr. Morrow, defendant's Exhibit B, "Mrs. Splane and Mrs. Schultz were never frank with us concerning the extent and basis of the relationship which had grown up between them. We knew that substantial sums of money were being spent by Mrs. Splane in financing Mrs. Schultz's mine. We were told that she and Mrs. Schultz were partners. She asked us to draw a contract on one occasion which showed the relationship to be in the nature of a loan of something in excess of $100,000 payable solely out of a percentage of the proceeds of the mine. We drew the contract according to instructions and forwarded it to Mrs. Splane with a letter explaining the nature of the contract and advising her not to sign it. She followed our advice in this regard, but, we learned, went to another attorney and had other and different legal papers drawn. It is now apparent that Mrs. Schultz rescued Mrs. Splane from Mrs. Stafford, not to save her, but in order to exploit Mrs. Splane herself. . . . Then Mr. Splane and his sister came to California to contact their mother. She refused to see them and refused to make known her whereabouts. We were not informed as to where she was, although she corresponded with us during that time from various places. The children hired Cantillon & Glover, who made an investigation and brought incompetency proceedings against their mother. We were employed by Mrs. Splane to contest these, which we did as vigorously as our abilities would permit.

"In my opinion, and in the opinion of eminent psychiatrists Mrs. Splane is not incompetent as far as any mental defect is concerned. She was fighting for her personal liberty and her freedom. She considers her property her own. All her children had received from a quarter to a half million apiece at the death of her husband, and she felt she could do as she pleased with her money. Her husband had died in 1926 and she had lived her own life, with only occasional contact with her family since that time. She told us that her children were trying to interfere with her liberty and were interested only in her money and were trying to anticipate her death.

"During a long trial which followed, the attack was made

on the relationship between Mrs. Splane and Mrs. Schultz. . . . Both refused to take the witness stand—the (former) on account of illness, and her whereabouts were kept secret from everybody, including ourselves. . . . We were forced to gain our information through Mrs. Schultz and through various other attorneys whom Mrs. Splane had hired for various other purposes. The situation was extremely unsatisfactory, and on several occasions we threatened to withdraw. As the matter progressed, we were afraid to withdraw and also afraid to continue. We were becoming increasingly convinced that Mrs. Splane, while not mentally incompetent, was being made the victim of artful and designing persons. Our final decision was that we should stay in the case and do what we could to protect her.

"When she was found incompetent, Mrs. Splane went to Nevada and employed attorneys to organize a corporation called the Silver States Securities Company. They did so and then she entered into a contract with that company whereby she transferred all her Pennsylvania assets to it in return for all of its capital stock. Under the declaratory relief provisions of the Nevada law, they had their transaction approved by the Superior Court of Washoe County. The attorneys then went East to collect the assets. From Pennsylvania they telephoned me, which was my first knowledge that Mrs. Splane was out of this state or had engaged in any of these transactions. I immediately informed the court and opposing counsel.

"Mrs. Splane authorized me to appeal from her incompetency judgments . . . separate appeals being taken. Appeals were subsequently taken from the orders granting the guardians interim powers, and supersedeas proceedings were instituted in the Supreme Court. Other appeals from orders subsequent to judgment followed. . . . Mrs. Splane was arrested in Nevada on a habeas corpus proceeding. We went to Nevada and successfully defended in the habeas corpus matter. In the meantime, we were engaged in the presenting and prosecuting of six appeals from various orders made in the incompetency matter. I endeavored to get Mrs. Splane to return to California, not as a prisoner, but voluntarily, and prosecute a petition for restoration. I secured from her and Mrs. Schultz and all of her associates the agreement that they would not endeavor to cause Mrs. Splane to invest in

any project, and that they would assist in effecting the settlement by the means I suggested, of putting all her assets in trust, with income to her, and corpus upon her death to her children.

"Shortly after this our influence with Mrs. Splane began to wane. Suggestion was made thereafter that in the restoration proceeding we should withdraw in favor of W. I. Gilbert (whose) death prevented this program from being carried out."

The trial on the restoration proceeding resulted in denial of the petition therein, but also resulted in the severance of the relationship between appellant and Mrs. Schultz.

Again quoting from Mr. Mayock's letter to Mr. Morrow, defendant's Exhibit B: "The Silver State Securities Company which, you will recall, was the Nevada Company, had instituted a proceeding to secure Mrs. Splane's assets under their contract in the Pennsylvania courts. They were relying upon their Nevada judgment and were relying upon the proposition that the judgment of incompetency was not final. I suggested to the attorneys who represented the guardian and to the attorneys who represented the children that the only way to settle the matter was to dismiss our appeals, which would make our judgment final, and thereupon Mrs. Splane's estate would not flow into Nevada, but would come to California to be administered under a guardianship. This was done because I found out in April, through one of Mrs. Splane's other attorneys, that we had been deceived as to the stock of the company, and that Mrs. Schultz had had approximately two-thirds of it transferred into her name. This information, of course, we gave to the guardian and then dismissed our appeals, with the result that the Pennsylvania litigation went in favor of the guardian instead of in favor of the Nevada corporation.

"Later an attempt was made to set aside our dismissals, which we successfully resisted in the Supreme Court. We were able gradually to divorce Mrs. Splane's affections and confidence from Mrs. Schultz and her associates, and to establish them where they actually belonged—in her son and daughter. The family is now reconciled and acting as a unit in protecting her estate from improper charges and bills which accrued during the Stafford and Schultz episodes. We secured, in the presence of the Probate Court, the promise of the guardian of the person to resign as soon as the funds

are transferred from Pennsylvania to the custody of the California guardian of Mrs. Splane's estate. In this way Mrs. Splane will regain all of her personal freedom, and will have only such restraint as to her estate as is necessary for its protection in the hands of the guardian. In our opinion, she is better protected in the continuance of the guardianship over her estate than she would be as a beneficiary of a voluntary trust wherein she was the trustor as well."

The reporter's transcript of the evidence, both oral and documentary, adduced at the trial herein contains 1,148 pages. An examination of this transcript reveals evidence of the employment, and the nature, character and extent of the services rendered by respondents to appellant, substantially as set out in Mr. Mayock's letter to Mr. Morrow heretofore referred to, and as well, evidence of the reasonable value of such services, as found by the trial court.

Appellant does not seriously question either the employment or the fact that services were rendered, but contends that respondents did not act in good faith and were guilty of fraud in their conduct toward her, because they knew and had previously represented Mrs. Schultz, who is shown by the record herein to have exerted great influence over appellant. Appellant also lays great stress on the fact that Mrs. Schultz had been convicted for a violation of the Corporate Securities Act in connection with a mining transaction, for which she served a term of imprisonment, after an affirmance of such conviction by this court. As to this, the trial court found that "Flora M. Schultz had later been granted a complete pardon by the Governor of California on the ground that her conviction constituted a miscarriage of justice."

There is no direct evidence of unfair dealing on the part of respondents and appellant bases her contention in that regard upon certain inferences drawn mainly from the testimony of respondents themselves, together with the conviction of Mrs. Schultz, heretofore mentioned.

Appellant knew Mrs. Schultz and permitted her to act as her agent for many months prior to the time appellant employed respondents at which time she stated to them that she knew all about Mrs. Schultz.

On the question of fair dealing, it was stated as follows in the case of *American Box & Drum Co.* v. *Harron*, 44 Cal. App.2d 370, 377 [112 P.2d 332] :

"In the absence of proof of facts and circumstances which constitute fraud as a matter of law, we are not prepared to say that the trial court was incorrect in drawing an inference of fair dealing rather than of corrupt practice. In *Estate of Ross,* 199 Cal. 641, 651 [250 P. 676], the court said: 'It is true that the trial court is the exclusive judge of the weight to be given to the evidence, but it is also true that the presumption is in favor of honesty and fair dealing (see *Estate of Sweetman, supra,* at p. 28 [185 Cal. 27 (195 P. 918)]), and the burden is upon the party asserting the fraud to prove it by some substantial evidence (12 Cal.Jur. 817). The facts and circumstances shown in evidence must have given rise at least to a reasonable inference of fraud and not a mere suspicion thereof (*Roberts* v. *Burr,* 135 Cal. 156 [67 P. 46]). Indeed it has been held that "if there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of the court or jury to draw the inference favorable to fair dealing." (*Ryder* v. *Bamberger,* 172 Cal. 791 [158 P. 753].)' "

The record herein further discloses that respondents, in serving a difficult client at best, did everything possible to protect her interests, even though their instructions came to them from her through the medium of Mrs. Schultz. A review of the record reveals ample evidence to sustain the finding of the trial court that appellant's charges, to the effect that respondents engaged in unfair dealings with appellant, neglected their duty toward her or were guilty of fraud or neglect in discharging their obligations as her attorneys, were groundless. In the instant case, respondents need not rely upon the presumption in favor of honesty and fair dealing (*American Box & Drum Co.* v. *Harron, supra*), because there is in the record abundant evidence to sustain the conclusion arrived at by the trial judge that respondents discharged their duties as attorneys for appellant with honesty, industry and fidelity.

Sufficient substantial evidence was presented at the trial herein to support the findings and judgment of the trial court.

Appellant urges that the award of $25,000 as attorneys' fees is excessive.

"Pursuant to the general doctrines governing appeals, an

appellate court will not set aside the findings of the trial court or reverse the judgment rendered thereon if they are at all supported by the evidence. Thus, where the trial court has fixed the compensation of an attorney upon the consideration of the evidence and its own judgment, the appellate court will not interfere unless a plain and palpable abuse of its discretion has occurred. Where the evidence without conflict places the value of an attorney's services at a figure which fully warrants the verdict as reduced by the action of the trial court, the appellate court will not interfere therewith on any theory that is not warranted by the evidence. So, also, where the testimony of two witnesses places the value of an attorney's fees as the sum awarded, the finding will not be disturbed, although there is other evidence contradictory.'' (3 Cal.Jur. 718, and authorities there cited.) See. also, *Matthiesen* v. *Smith*, 16 Cal.App.2d 479, 481 [60 P.2d 873].

In the instant case, the expert testimony of two attorneys fixed the reasonable value of respondents' services at $43,890 and $50,525, respectively. Appellant introduced no evidence upon this question, and the court awarded the sum of $25,000. This amount does not shock the conscience and is supported by the evidence.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied February 3, 1943, and appellant's petition for a hearing by the Supreme Court was denied March 8, 1943.