**F. S. BOWEN ELECTRIC CO., Inc., use plaintiff, Appellant,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, defendant, and Porter Construction Company, Inc., third party defendant, Appellees.**

No. 7598.

United States Court of Appeals Fourth Circuit.

Argued March 7, 1958.

Decided June 2, 1958.

Michael A. Schuchat, Washington, D. C. (Paul R. Harmel, and Geiger, Harmel & Schuchat, Washington, D. C., on brief), for appellant.

Martin R. Fain, Washington, D. C. (Richard A. Bishop, and Jackson, Gray & Fain, Washington, D. C., on brief), for appellee, United States Fidelity & Guaranty Co.

Benj. W. Dulany, Washington, D. C. (William C. Bauknight, Fairfax, Va., and Douglas, Obear & Campbell, Washington, D. C., on brief), for appellee, Porter Construction Co., Inc.

Before PARKER, Chief Judge, HAYNSWORTH, Circuit Judge, and HOFFMAN, District Judge.

HAYNSWORTH, Circuit Judge.

In December 1955, Porter Construction Co., Inc., a Maryland corporation engaged in the business of a general construction contractor, made certain transfers which were challenged by its surety, United States Fidelity and Guaranty Company, as being in violation of the Uniform Fraudulent Conveyance Act, which is incorporated in Article 39B of the Code of Maryland (1951).

The District Court for the Eastern District of Virginia set aside certain of the questioned transfers, aggregating $32,880.06, and F. S. Bowen Electric Co., Inc., the alleged transferee, has appealed. A notice of a cross-appeal directed to the failure of the District Court to set aside the transfer of another item was filed, but was dismissed with consent of all parties.

Bowen company here contends primarily that the transfer of the $32,880.06 did not render the Porter company insolvent within the meaning of § 4 of the Act

While the Porter company had a net worth, as of September 30, 1955, as shown by the report of its own accountant, of only $26,994.88, Bowen asserts that a balance sheet item of approximately $142,000, entitled "Reserve for Unearned Profit on Work in Progress," [1] should be treated as part of the net worth.

Porter company kept its books on the completed contracts method. That method has come into widespread use because of the difficulty, or impossibility, of accurate determination of profit or loss on large construction projects until the work is substantially completed. Such work is subject to so many vicissitudes and unexpected expense that accruals of income, during the early stages of construction, were not infrequently found to be most unrealistic in the light of actual profit or loss as finally determined, with accuracy, upon completion of the contract.

Though use of the completed contracts method of accounting avoids the necessity of estimating interim profit or loss [2] on uncompleted contracts as of the date of each financial statement, it does not obviate credits and charges to other balance sheet items which inevitably result from current performance of the work. Wages paid must still diminish cash, and intermediate billings increase accounts receivable. Necessarily, therefore, use of the method requires offsetting balance sheet entries. If a temporary excess of accumulated cost over the aggregate of related intermediate billings is not to reduce net worth, it must be shown as an asset, while, conversely, a temporary excess of intermediate billings over accumulated cost must be shown as a liability on the balance sheet.

The ratio, at any given moment, between intermediate billings and accumulated cost is determined largely by billing practice and the initial rate of cost accrual. It has little, if any, relationship to interim, or ultimate, profit or loss. A contractor who agrees to construct a building for a financially responsible owner at a fixed price of $1,000,000 and who completes the work at an actual cost of $950,000 has suffered a loss at no stage of the work, though he submits no bill until the project is completed. Nor could he conceivably be said to have earned a profit of $1,000,000 if that amount was paid to him in full before he began his performance of the contract. Until, in the latter instance, he has discharged his obligation under the contract, that obligation—measured, under the completed contracts method, by the excess of billings over accumulated cost—must be carried as a liability upon a financial statement.

■ Because the obligation of the contract is in every sense current, the Committee on Accounting Procedure of the American Institute of Accountants, in October 1955, issued its Bulletin No. 45, recommending that such excess of billings over related cost be shown as a current liability, rather than, as theretofore had been the practice, as a deferred liability. Such bulletins are generally recognized as setting the standards of practice in the accounting profession, but it is quite immaterial here whether the item is properly treated as a current, or a deferred, liability. It is, in any event, a liability, and, under no circumstances, could it be treated as a credit to earned surplus.

For the reasons suggested, the contention of the Bowen company that the "Reserve for Unearned Profit * * *" is not a liability because it is not "owed" to anyone overlooks the actual obligation of the contractor and the inherent necessity of balancing a balance sheet without wanton distortion of apparent net worth.

In fairness to the principals involved, it may be stated that the record strongly

1. The item represents the excess of intermediate billings over related accumulated costs on projects under construction.

2. If there is reasonable basis to anticipate an ultimate loss in a particular contract, good accounting practice, if the matter is material to the statement, may require that a financial statement adequately reflect the probability of such loss, even though the completed contracts method is used.

indicates they believed the Porter company to have been worth much more than it was, and that they regarded the "Reserve for Unearned Profit * * *" as something akin to realized profit, but as the president of the Porter company testified, "I didn't understand the audit myself, had to have somebody to tell me." The misconceptions of the principals may lead to imprudence occasioning insolvency, but they cannot support a finding of solvency where clearly there was insolvency.

Determination of the issue of solvency, under the statute, requires an appraisal of probable liabilities as well as the salable value of assets. A particular accounting method should not so circumscribe the inquiry that unsalable assets are treated as salable, or technical and contingent liabilities, as absolute and ascertained. The proof here, however, was that the uncompleted contracts ultimately resulted in tremendous losses. No engineering or other appraisal was offered which would justify a finding that there was a reasonable basis for current accrual of profit in the uncompleted contracts on the date of the transfers in question. There is general reference to increases in costs some six months later, but nothing to require a finding that, on the date of transfer, there was any reasonable basis to determine an interim, or ultimate, profit. Instead, primary reliance is placed upon the fortuitous circumstance that intermediate billings temporarily exceeded accumulated cost, a circumstance which we find to have no necessary relevance to the issue, or probative force. The District Court was clearly justified in finding no ascertainable profit in the contracts in process of completion.

Because it was contended that one of the transferred items was not reflected in the balance sheets and that the net worth was greater than the cash item transferred, the District Judge considered the salable value of the fixed assets of the Porter company, finding it to be no more than $15,000 to $20,000. The company had been organized in 1952. By September 1955 it had a gross fixed asset account of $43,937.97, of which $19,730.53 were "tools," as distinguished from "construction equipment," items which frequently, if not ordinarily, are not capitalized. Over the period, depreciation on all fixed assets of $7,880.84, or just under 18% of the cost, had been accumulated. As of November 30, 1955, the fixed asset account stood at $51,801.94, of which $21,596.77 represented tools, and only $9,266.78 was shown as depreciation against the total account.

If we assume that the depreciation rates were permitted, even required, by taxing authorities the resulting book values of construction equipment, vehicles, office equipment and expendable tools have no necessary relation to "salable value," the standard prescribed by § 2 of the Act. An appraisal by a dealer indicates the "salable value" of these assets to be a fraction of the net book value and, as the District Judge found, it is common knowledge that the resale value of such assets is much below original cost discounted by less than 18%.

The main thrust of Bowen's argument here is that book values, however unrealistic, are conclusive on the issue of salable value, while liabilities which have not been precisely ascertained in amount are to be completely ignored. The District Judge was quite correct in finding no merit in either branch of the contention.[3]

While the Bowen company denies that it was the transferee of the disputed items, the record is quite sufficient to sup-

---

3. It was contended that the assets of the Porter company were overstated and its liabilities understated in other respects. We need not consider these other contentions, however, for it is clear from what has been considered, that the company was insolvent immediately after these transfers. Nor need we consider the possible application of § 5 of the Act, for the transfers left the company insolvent, not with just an unreasonably small capital for the volume of business it was conducting.

port the finding of the District Judge that it was. One of the items, a check for $20,100 was made payable to F. S. Bowen, the controlling, or sole, stockholder of the Bowen company, and was immediately endorsed by him and deposited to the credit of the Bowen company. The fact that, on the books of the company, it was entered as a credit to the personal account of Mr. and Mrs. Bowen does not give the company the status of a bona fide purchaser. If it was not intended, from the outset, to be the recipient of the funds, it did receive them and it took them charged with knowledge of all of the circumstances.

■ The other item was a release of a portion of a substantial claim of the Porter company against the Bowen company. Several different items made up the total claim, the largest single item being the cost of construction of a warehouse upon land owned by Bowen individually. The account was carried on the books of the Porter company in the name of the Bowen company, however, and it was settled with funds advanced by the Bowen company. There was abundant basis for viewing the relations of the parties, with respect to this particular work, as if Bowen company was the general contractor and the Porter company the subcontractor and for the finding that the work was performed on the credit of Bowen company, which would remain liable to its subcontractor, whatever reductions or discounts it intended to pass on to the owner.

■ The surety company had to take over Porter's construction contracts. In the performance of those contracts it has expended several hundred thousand dollars in excess of its receipts, and there is little, if any, doubt that its loss, when finally determined, will be substantial. Meanwhile, it has the standing of a creditor to maintain this action,[4] and

there is no merit in Bowen's contention that the action is premature.

The allowance of prejudgment interest on the cash item transferred was within the sound discretion of the Trial Court. We find no basis for concluding that the discretion was abused in its exercise here.

Affirmed.[5]

---

4. See American Surety Company of New York v. Marotta, 287 U.S. 513, 53 S.Ct. 260, 77 L.Ed. 466.

5. The late Chief Judge John J. Parker expressed his approval of the result in the foregoing case, but the opinion, written after his death on March 17, 1958, did not receive his consideration.