340 P.2d 193

**SANDIA DEVELOPMENT CORPORATION, a corporation, Appellant,**

v.

**Carey ALLEN, Appellee.**

No. 6271.

Supreme Court of Arizona.

June 3, 1959.

Stahl, Murphy & Blakley, and Flynn, Stewart & Allen, Phoenix, for appellant.

George M. Sterling and Leslie C. Hardy, Phoenix, for appellee.

JOHN F. MOLLOY, Superior Court Judge.

Carey Allen, the appellee, recovered a judgment in the sum of $30,400 against M. C. Lundgren, his wife Beulah, and La Mar Homes, Inc. Writ of garnishment after judgment issued against appellant, Sandia Development Corporation. In the interest of the elimination of confusion, the appellee will be designated herein as the plaintiff; the Lundgrens and La Mar Homes, Inc., as defendants or by individual name, and the appellant as garnishee.

Garnishee answered it was not indebted to defendants and did not have any ef-. fects of defendants in its possession. Plain-. tiff controverted this answer and filed tender of issue which, after trial amendments allowed by the court, states in effect that garnishee was indebted to defendants under a written agreement of August 6, 1951; that garnishee had in its possession moneys, property and things of value belonging to defendants in pursuance of said agreement; that defendants were the owners of 20 shares of capital stock of garnishee; that during the year 1951 garnishee converted to its own use all of defendants' assets; that on or about June 29, 1950, defendant La Mar Homes, Inc., wrongfully and illegally entered into a joint venture agreement with garnishee and thereby transferred to the joint venture all of the assets of La Mar Homes; that this transfer was illegal and void for the reason that garnishee had not complied with Arizona laws relative to the qualification of foreign corporations to do

business in this State and that by reason of the premises garnishee became the trustee of the properties of La Mar Homes for the stockholders and creditors of La Mar Homes. Trial before the court was had and the garnishee requested findings of fact and conclusions of law. No findings of fact were signed and filed, the court merely ordering the clerk to place in the minutes the following (in addition to five conclusions of law):

"(1) That the defendant garnishee Sandia Development Corporation, a corporation, was at the time the garnishment herein was served upon it, indebted to the defendants, M. L. Lundgren and Beulah Lundgren, his wife, and La Mar Homes, Inc., a corporation, or had in its possession things of value belonging to said defendants in excess of $30,400.00, together with interest thereon at the rate of 6% per annum from the 30th day of December, 1950;

"(2) The Court further finds that at the time of the service of said writ of Garnishment upon said defendant-garnishee that said defendant-garnishee was a corporation, and that the defendant M. L. Lundgren was the owner and holder of shares of stock in said corporation;"

and entered judgment against garnishee in the sum of $30,400 with interest and costs.

The evidence discloses that the garnishee is a New Mexico corporation which was first qualified to do business in the State of Arizona on August 6, 1951. Prior to this time it had entered into a written agreement with the defendant, La Mar Homes, Inc., dated June 29, 1950, by which the parties agreed to enter into a joint venture or partnership to be known as La Mar-Sandia Company for the purposes of "tract development". The parties agreed to construct a minimum of 130 residential homes and to construct such additional homes as might be mutually agreeable. The contract recited that La Mar Homes, Inc., referred to in the contract and hereinafter as "La Mar", was a qualified builder and was then engaged in construction work in and around Phoenix, Arizona and that Sandia Development Corporation, referred to in the contract and hereinafter as "Sandia", desired to participate in "tract development" with La Mar.

The contract provided that La Mar would do all of the construction work, at cost and without any fee or compensation, for the joint venture; that Sandia should immediately pay to the joint venture $100,000 in cash; that La Mar should transfer to the joint venture materials and equipment then used by it in the construction business and would assign to the joint venture net proceeds from certain escrows pertaining to sales of houses previously constructed by La Mar, so that "the credit" to be received by La Mar for materials and equipment so transferred and the net proceeds of es-

crow so assigned would equal a contribution to the joint venture of $100,000.

After these capital contributions of Sandia and La Mar should be "used up", the contract provided that Sandia should advance to the joint venture an additional sum of $100,000 cash. M. L. Lundgren, one of the defendants in the action, was a party to this agreement, though he was to have, as an individual, no share in the profits of the joint venture nor was he to be "a party to such joint venture." At the time of the execution of this agreement, Mr. Lundgren was the president of both La Mar and Sandia, and was financially interested, to a greater or lesser extent, in both corporations. In the contract, M. L. Lundgren agreed to devote his time and best efforts to the interests of the joint venture, without compensation. Funds realized from the joint venture operations were to be first used to repay to Sandia its second $100,000 contribution and thereafter distribution should be made on an equal basis between Sandia and La Mar, each to receive one-half of any profits.

Lundgren, according to his own undisputed testimony, was the only investor in the La Mar corporation and, though he spoke of three stockholders in the corporation (the other stockholders presumably being token shareholders), his undisputed testimony was also to the effect that no certificates of stock had ever been issued by La Mar. The interest of Lundgren in Sandia was disputed in the evidence. It was Lundgren's contention that he had transferred into Sandia at its inception assets of the worth of $20,000, for which he was to receive $20,000 in stock. It was undisputed, however, that Lundgren did not receive any stock certificate and that his certificate of stock remained with the corporate records. Lundgren remained the president of Sandia until his written resignation dated August 4, 1951, was accepted by its board of directors on August 6, 1951. The by-laws of Sandia, Art. IX, Sec. 8 thereof, provided that the President was the "chief executive" of the corporation, and "subject to the control of the board of directors", in charge of its business and affairs.

Initially, a book transaction was made whereby all or part of the assets of La Mar (the evidence is conflicting as to whether or not all or only part were involved) were "transferred" from La Mar to the joint venture. La Mar, however, continued to hold title to all real property involved and there was, as far as evidence discloses, no formal assignment or bill of sale made of any such property so "transferred". A Mr. Richard Burgess, a certified public accountant, was employed to set up the books for the joint venture and he continued to be in charge of these books until October 31, 1951, at which time the joint venture had been substantially liquidated.

Statements of accounts prepared by Mr. Burgess disclose that, while Sandia contributed the capital required of it by the joint venture agreement, La Mar did not. As of December 31, 1950, these accounts show that La Mar had contributed to the joint venture $38,454.58 in excess of La Mar's liabilities transferred to the joint venture and assumed by the joint venture. This was the high water mark of La Mar capital account in the joint venture according to these accounts. From then on, the capital account was continuously drawn upon, and an account receivable was set up on the joint venturers' books, to keep a record of indebtedness incurred by La Mar on the joint venture books. For a time, La Mar's capital account was kept separate from this account receivable but the account receivable increased until it exceeded the capital account of La Mar and, in March of 1951, Mr. Burgess applied the capital account of La Mar against the account receivable of La Mar, liquidating its capital account. The account receivable continued to increase so that by October 31, 1951, the books showed that La Mar owed the joint venture $25,734.77. After this date the joint venture accounts were taken over by another certified public accountant doing business in Beverly Hills, California, by the name of Albert E. Kurz. Mr. Kurz rendered two accounts after he took over the books, which accounts were based upon, and substantially in agreement with, the accounts rendered by Mr. Burgess.

Previous to this, on November 1, 1951, La Mar, Sandia, and Lundgren had entered into a "modification agreement" as to the joint venture, which substantially changed the agreed division of profits in favor of Sandia. In this agreement, La Mar and Lundgren personally guaranteed to Sandia that Sandia would receive a net profit of $300 per house on all of the houses listed in Group One of this contract, which houses totaled 497. The agreement further provides that a new and complete account procedure should be set up under the overall control of Mr. Burgess.

On or about May 5, 1951, La Mar and Lundgren wrote a letter to Sandia, in which they acknowledged that neither had any capital investment remaining in the joint venture and that they were executing and delivering to Sandia five items, to "guarantee" to Sandia the faithful performance of the joint venture agreement, these five items being as follows:

"1. Second mortgage and note on an eleven unit apartment building in Bisbee, Arizona.

"2. Quit claim deed on house on Ocotillo Rd known as lot 22 and E½ of lot 23, Milton's Grove, Maricopa County, Arizona.

"3. Assignment of all my rights and interest in the Sandia Development

Corporation as represented by capital stock and notes.

"4. Assignment of Water Contract refund on Creighton Manor Tract, Phoenix, Arizona.

"5. Assignment of F.H.A. fee refund of $25.00 per house on all houses built under the joint venture."

This letter was accepted in writing by Sandia and written assignments and deeds were executed to transfer the assets listed to Sandia.

On or about August 6, 1951, Sandia, La Mar and Lundgren entered into a written contract to terminate and liquidate the joint venture. This agreement was the result of extended bargaining sessions between La Mar, Lundgren and Sandia, all parties being represented by legal counsel. The agreement provides that Sandia shall be the liquidating agent for the corporation and all assets should be forthwith transferred to Sandia. It also changes the formula for dividing the profits between the joint ventures, the formula being rather complicated. It provides that Sandia shall first pay out of the assets of the joint venture, as liquidated, all of the debts and obligations of the joint venture. Paragraph 10 provides for the distribution of the assets of the joint venture after the payment of its obligations. This paragraph first provides that Sandia shall receive its capital investment and then the following payment is to be made:

"'B' To Sandia ninety (90%) percent of a sum to be computed by subtracting any profits in excess of Twenty-four Thousand Dollars ($24,000) realized from the sale of properties in Tisdale Unit No. 3, Group 1, from the sum of One Hundred Ten Thousand Seven Hundred Dollars ($110,700). The last Twenty Thousand Dollars ($20,000) of the above amount stated to be paid to Sandia, however, shall not be paid to Sandia, but shall be paid direct to Lundgren."

It is clear that this formula guarantees to Sandia considerably less profits than had been guaranteed to it by the November 1, 1950, modification. The agreement further provided that at such time as Sandia should receive back its capital investment and its share of the profits, as stated in the above-quoted portion of the contract, Lundgren should receive back Items 1 and 2 of the five items of collateral described in the May 5, 1951, letter agreement.

In pursuance of this agreement, all of the assets of the joint venture were transferred to Sandia and it proceeded to liquidate the affairs of the joint venture. All such transfers to Sandia took place after Sandia had been qualified as a foreign corporation to do business in this state. At this time, August 6, 1951, the joint venture had sold all but approximately 45 of the approximately 350 houses constructed by it. No more

construction was commenced after August 6, 1951, and by October 31, 1951, all but ten of these houses had been sold.

Mr. Burgess testified that the profits from the "Tisdale Unit No. 3, Group No. 1" was approximately $18,500 and definitely less than the $24,000 figure mentioned in Paragraph "B" of the agreement. This would result in Sandia being entitled to receive, under the August 6, 1951, agreement, the first $79,630 of profit of the joint venture. According to the statement of Mr. Burgess dated October 31, 1951, the joint venture had a profit of $72,768.09, which accounting assumed that all the houses would be disposed of at the agreed price (10 were unsold as of that date), that La Mar would pay to the joint venture an indebtedness of $25,734.77 owing to the joint venture, and that Lundgren would pay to the joint venture an indebtedness of $3,693.16. Mr. Kurz's accounting, dated May 15, 1953, indicates that under the August 6, 1951, agreement there is a deficiency owing to Sandia in the sum of $45,072.41, after taking into account certain worthless account receivables, including the two above.

Though the books of the joint venture were in possession of legal counsel for La Mar and Lundgren since May 5, 1955, no accountant was called by the plaintiff to controvert the accounts submitted by the two accountants, Burgess and Kurz, who testified on behalf of the garnishee. M. L.

Lundgren testified that in "his opinion" the joint venture was indebted either to him or to La Mar in an amount between $50,000 and $100,000. In other portions of his testimony, Lundgren stated that his estimation in this regard was not a "conclusion" but an "opinion", that he did not understand the computation of profits made by the accountants, and that "those books did need an experienced accountant to go through for days and days to get a complete accounting." With this outline of the facts, the court will proceed to discuss the legal issues raised.

The appellant strongly contends there was no evidence to support any judgment against the garnishee and that the rightful order of this court should be to enter judgment for the garnishee.

█ In order to determine the correctness of this contention, the court must examine the several legal theories upon which the plaintiff's tender of issue, as amended, was based. In this consideration, it must be remembered that the plaintiff, being only an unsecured creditor of the defendants, can, at the most, recover no more than the defendants themselves could recover against the garnishee in a direct action. Wilkinson v. Takesuye, 66 Ariz. 205, 185 P. 2d 778; Ellery v. Cumming, 40 Ariz. 512, 14 P.2d 709, 83 A.L.R. 1081; Valley Products, Inc. v. Kubelsky, 49 Ariz. 500, 68 P.2d 69, 38 C.J.S. Garnishment § 176.

The original tender of issue alleged that the garnishee was "indebted" to the defendants under a certain written agreement of August 6, 1951. The plaintiff now contends that there was sufficient evidence of such an indebtedness to support a judgment against the garnishee upon this theory. The plaintiff also contends that this agreement of August 6, 1951, is illegal in that it was entered into by Sandia before it was qualified to do business in this state in violation of Section 10-482, A.R.S., which reads as follows:

"No foreign corporation shall transact business in this state until it has complied with the requirements of § 10-481, and every act done prior thereto is void."

We are unable to find any evidence in the record that garnishee was indebted to defendants either at the time of the service of the writ of garnishment or at the time of the answer thereto. To the contrary, the court is of the opinion that all of the competent evidence presented during the trial establishes that, contrariwise, the defendants were indebted to Sandia under this agreement.

The only evidence indicating that Sandia might be indebted to the defendants in any amount was the opinion evidence of the defendant, M. L. Lundgren. The court does not deem this evidence to have any probative value. Ordinarily, opinion evidence upon the question of an indebtedness, from one who is not an expert in the field of accounting, is not competent (Albert Steinfeld & Co. v. Wing Wong, 14 Ariz. 336, 128 P. 354; 32 C.J.S. Evidence § 468; 20 Am.Jur., Evidence, section 765). This rule should be particularly applicable when, as in this case, the question of whether one party or the other to a joint venture is indebted to the other must be determined by the net result of literally thousands of separate financial transactions.

The plaintiff's original tender of issue also alleged that the garnishee had in its possession moneys, properties, or things' of value belonging to the defendants.

To substantiate this allegation, the plaintiff relies upon that provision of our code pertaining to unqualified foreign corporations, quoted above.

This court is inclined to agree that Sandia was doing business in this state at a time when it was not qualified to do so. We have held:

" * * * that, to come within the statute, a corporation must be engaged in an enterprise of some permanence and durability, and must transact within the state some substantial part of its ordinary business, and not merely a single act. * * * " Monaghan & Murphy Bank v. Davis, 27 Ariz. 532, 234 P. 818, 819.

In this case, the actions of Sandia, as one of two joint venturers in the constructing of hundreds of houses in the Phoenix area and in the engaging in the many transactions incident to tract development, would certainly meet the test above stated.

■ The court also agrees with the plaintiff's contention that it makes no difference whether the agreement of August 6, 1951, was entered into immediately before or immediately after the qualifying of Sandia to do business in this state on August 6, 1951. This agreement is predicated upon all of the prior operations of the joint venture, and the prior contracts entered into by the parties, and is so much related to the illegal activities of Sandia as an unqualified foreign corporation that this contract must stand or fall to the same extent as the prior contracts between the parties which it superseded and modified.

From the predicate laid, that the business conducted by Sandia prior to August 6, 1951, was in violation of the above-quoted Section 10–482 of A.R.S., the plaintiff would have the court find that the garnishee now owes the defendants in excess of $30,400. This court cannot reach such a conclusion. As has already been observed, as the result of the contracts entered into, there is no evidence that the garnishee was indebted to the defendants or either of them. If the defendants were entitled to recover anything from the garnishee, it must be based upon some equitable theory of restitution or rescission.

Assuming, without deciding, that garnishment proceedings will reach purely equitable claims of this nature, this court finds it impossible to untie the Gordian knot which has resulted from the multifarious transactions between the defendants and the garnishee, and the court does not believe that an Alexandrian slashing of the knot at this time would do justice to those concerned.

■ It is very evident the contractual relations of the parties had been substantially fully executed by the time the writ of garnishment was served on September 12, 1952. The authority seems to generally be that when contracts entered into by a nonqualifying corporation have been fully executed, that courts will not undo them (Fletcher Cyclopedia Corporations, Perm. Ed., Vol. 17, Section 8527, and Williston on Contracts, Revised Ed., Section 1787). Rights of third persons have intervened in that hundreds of homes have been sold to innocent third persons in pursuance of these contracts. The defendants are in no equitable position to take advantage of the failure of the garnishee to qualify as a foreign corporation in that the defendants themselves were at least partly responsible for garnishee's failure to qualify. The defendant, Lundgren, was the president of the garnishee corporation during

50

substantially all of the time it was doing business in this state in violation of the quoted statute and he, in turn, was the sole owner of the defendant, La Mar Homes. One seeking equitable relief must do equity before being entitled thereto, even when an unqualified corporation is concerned (Windisch v. Mortgage Security Corporation of America, of Norfolk, Va., 254 Mich. 492, 236 N.W. 880). This the defendants are in no position to do, and therefore the court finds no right of recovery against garnishee under equitable theories.

■ Those portions of the tender in issue alleging "conversion" of assets by the garnishee are unsupported by the evidence and, moreover, do not state a cause of action in a garnishment proceeding, 38 C.J. S. Garnishments § 91; Black v. Plumb, 94 Colo. 318, 29 P.2d 708, 91 A.L.R. 1334.

There appearing then to be no claim either in law or in equity established by any competent evidence in the record which could have been enforced by the defendants against the garnishee, it follows that the plaintiff cannot prevail in this garnishment proceeding. In view of this ruling of the court, it is deemed unnecessary to rule upon the additional assignments of error raised by the appellant.

It is Therefore Ordered that judgment be entered for the garnishee and against the plaintiff and for their costs in this action. The trial court is directed to determine the extent to which the garnishee is entitled to recover attorney's fees under applicable law.

Judgment reversed with directions.

PHELPS, C. J., and UDALL, JOHNSON and BERNSTEIN, JJ., concurring.

NOTE: Justice STRUCKMEYER having disqualified, the Hon. JOHN F. MOLLOY, Judge of Superior Court, Pima County, was called to sit in his stead and participate in the determination of this appeal.