623 P.2d 19

Manus R. SPANIER and Ann H. Spanier, his wife, Plaintiffs-Appellees,

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY, a Maryland Corporation, Defendant, Cross-Claimant-Appellee and Cross-Appellant,

Kenneth L. "Bill" Jenkins and Madge J. Jenkins, husband and wife, Defendants-Cross-Defendants-Appellants and Cross-Appellees.

Kenneth L. "Bill" JENKINS and Madge J. Jenkins, husband and wife, Defendants, Counter-Claimants-Appellees,

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY, a Maryland Corporation, Defendant, Counter-Defendant-Appellant.

Nos. 1 CA–CIV 4288, 1 CA–CIV 4279.

Court of Appeals of Arizona,
Division 1,
Department C.

Oct. 29, 1980.

Rehearing Denied Nov. 7, 1980.

Review Denied Jan. 6, 1981.

Warner & Angle by Charles R. Hallam and Jerry L. Angle, Phoenix, for Spanier.

Gust, Rosenfeld, Divelbess & Henderson by Richard A. Segal and Charles E. James, Jr., Phoenix, for Jenkins.

Moore, Jennings, Kepner, Scheffing & Hart by Donald W. Hart, Phoenix, for U.S. Fidelity & Guaranty Co.

## OPINION

HAIRE, Judge.

This consolidated appeal is procedurally complex, involving two separate appeals and a cross-appeal based on three separate judgments. However, the underlying facts are neither complicated nor controverted, at least insofar as concerns those issues we deem pertinent to the disposition of the questions raised before this court.

The trial court litigation resulted from the financial failure of a construction firm, Valley Distributors, Inc. (hereinafter Valley Distributors or debtor corporation).[1] At the time of its failure, Valley Distributors was engaged in the performance of a contract between Valley Distributors and appellees Manus R. Spanier and Ann H. Spanier (Spanier) for the construction of a medical building complex in Prescott, Arizona. The litigation was commenced when Spanier sued to recover damages resulting from the breach of that contract by Valley Distributors.

Among the defendants in the Spanier litigation were appellants Kenneth L. "Bill" Jenkins and Madge Jenkins (herein Jenkins, sometimes referred to in the singular). The Jenkins had been the sole stockholders of Valley Distributors, but had sold their stock to one Allen R. Staff prior to the time that the Valley Distributors-Spanier contract was entered into. As a part of this stock-sale transaction, a substantial part of the assets of Valley Distributors had been transferred directly to the Jenkins. Spanier's claim against the Jenkins was based in part upon the theory that this transfer of corporate assets to Jenkins constituted a fraudulent conveyance in violation of A.R.S. § 44–1005 (Uniform Fraudulent Conveyance Act, § 5), and that as a subsequent creditor injured by the fraudulent conveyance Spanier could pursue that claim directly against the transferee, Jenkins. *See* A.R.S. § 44–1009; *Sackin v. Kersting*, 105 Ariz. 464, 466 P.2d 758 (1970). An alternative theory urged by Spanier against Jen-

---

1. Although judgments were entered against Valley Distributors in the trial court litigation, it is not a party to the appeals pending before this court.

kins was that the transfer of corporate assets to Jenkins constituted an unlawful corporate dividend in violation of A.R.S. § 10–196 (1956) (repealed effective July 1, 1976). The trial court litigation resulted in a jury verdict and judgment in favor of the Spaniers and against the Jenkins in the amount of $144,854.79.

Appellee, United States Fidelity and Guaranty Company (USF&G)[2] was also a defendant in the Spanier litigation. Spanier's claim against USF&G was subsequently dismissed with prejudice and is not involved in these consolidated appeals. However, USF&G filed a cross-claim against the Jenkins in the Spanier litigation for various losses which USF&G had sustained on construction bonds issued by it on behalf of Valley Distributors. The USF&G cross-claim against the Jenkins was likewise based upon fraudulent conveyance and illegal corporate dividend theories. By the time of trial Spanier and USF&G occupied substantially identical procedural positions in asserting their claims against the Jenkins, and the jury returned its verdict in favor of USF&G and a judgment was accordingly entered against the Jenkins in the amount of $105,998.94.[3]

During the course of the Spanier litigation, but prior to the trial involved in these appeals, both Spanier and USF&G obtained default judgments against the contractor, Valley Distributors. Thereafter, they each had writs of garnishment issued against the Jenkins as the garnishee defendants, on the theory that the Jenkins owed money to the principal debtor, Valley Distributors, by reason of the claimed fraudulent conveyances or illegal corporate dividends. In their pretrial statements, the parties stipulated that the trial of the issues raised in the garnishment proceedings would be consolidated with the trial of the other issues. The jury verdicts against the Jenkins were general and did not specify the basis upon which liability was determined.

Further procedural background and factual details will be set forth in our discussion of the specific questions involved in these appeals.

## THE SPANIER JUDGMENT AGAINST JENKINS (CIV 4288)

The principal theory which Spanier urges in support of his claim against Jenkins is that Jenkins, as the sole stockholder of the defendant construction corporation, transferred some $360,000 of corporate assets to himself in violation of the Uniform Fraudulent Conveyance Act, A.R.S. § 44–1005 (U.F.C.A., § 5), which provides:

"Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who became creditors during the continuance of such business or transaction without regard to his actual intent."

Appellant Jenkins asserts that section 44–1005 is inapplicable because the undisputed facts show, as a matter of law,[4] that: (1) the conveyance was made in exchange for "fair consideration"; (2) the conveyance did not leave the corporation with an "unreasonably small capital" and in any event, (3) neither Spanier nor USF&G had standing to claim the protection afforded by section 44–1005 because the construction busi-

---

2. In 1 CA–CIV 4288, USF&G is both an appellee and a cross-appellant; in 1 CA–CIV 4279, USF&G is the appellant.

3. While the Spanier and the USF&G claims against the Jenkins were based upon identical fraudulent conveyance and illegal corporate dividend liability theories, the damages sustained by each were based upon different transactions, and, therefore, the amounts of their judgments against the Jenkins vary in amount.

4. Appellant Jenkins does not raise on appeal any evidentiary or instructional errors. His theories were all presented to the jury and therefore, he cannot prevail on appeal unless the evidence concerning the material facts is undisputed, and based upon that undisputed evidence, he is entitled to judgment as a matter of law.

ness engaged in by Valley Distributors after the conveyances was so different in nature and scope from its prior business that Spanier or USF&G could not be said to have become creditors "during the continuance of such business."

The alleged fraudulent conveyances grew out of a transaction pursuant to which the Jenkins sold all of the outstanding stock of the corporate debtor, Valley Distributors, to a buyer named Allen R. Staff and his wife, Gretchen L. Staff. The agreement was in writing, and the parties thereto were the Jenkins and the Staffs. Valley Distributors was not a party to the agreement. The stated purchase price for the stock was $395,000, with all of the stock to be transferred to the Staffs. However, the major part of the purchase price was to be paid to Jenkins, not by the Staffs, but rather by the corporation, as follows:

| | |
|---|---:|
| Cash from Valley Distributors: | $110,000 |
| A promissory note executed by *Valley Distributors* and payable to K. L. Jenkins, secured by a mortgage on the corporation's real property: | 150,000 |
| A promissory note executed by *Valley Distributors* and payable to K. L. Jenkins, secured by the personal property owned by Valley Distributors: | 30,000 |
| An assignment of selected accounts receivable of Valley Distributors: | 60,000 |
|    Total amount paid by the corporation | $350,000 |

The only part of the $395,000 which was to be paid by the Staffs was $45,000, evidenced by an unsecured promissory note, payable in installments.

Pursuant to the agreement, $110,000 of corporate cash was immediately transferred to the Jenkins. The selected accounts receivable, valued at $60,000, were assigned, and within a short time Jenkins received $59,500 cash from them. The promissory notes in the amount of $150,000 and $30,000 were executed by the corporation and secured by mortgages[5] on the corporate realty and personal property, and after receiv--

ing some payments, he successfully foreclosed on the mortgages, recovering virtually all of the corporation's real and personal tangible property. Also, at the time the agreement was entered into, Jenkins received from the corporation some $10,000 in automobiles, and paid cash for them directly to Staff rather than to the corporation.

Without question, these transfers to Jenkins left the corporation insolvent within any definition of that term, and certainly within the meaning of the Uniform Fraudulent Conveyance Act (A.R.S. § 44–1002A). *See generally, Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351 (1963). The evidence shows that immediately before the conveyances, Valley Distributors had a net worth in round figures of $250,000. Simple arithmetic shows that the transfer of $360,000 to Jenkins exceeded the corporation's net worth by $110,000, creating a negative or deficit capital of $110,000. In fact, the jury was instructed that the transfer rendered the corporation insolvent, and the legal validity and factual basis for that instruction has not been questioned on appeal.

Against the foregoing factual background, we now consider appellant Jenkins' contention that the conveyances to him were not made "without fair consideration" and thus were not fraudulent within the meaning of A.R.S. § 44–1005.

The term "fair consideration" as used in the Uniform Fraudulent Conveyance Act and pertinent to this appeal, is defined in A.R.S. § 44–1003 as follows:

> "Fair consideration is given for property, or obligation:
>
> 1. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, . . . ."

No argument is made that the $360,000 in assets transferred from the corporation were not conveyances within the meaning of the act, nor is it disputed that the corpo-

---

**5.** Mortgages constitute conveyances within the meaning of the Uniform Fraudulent Convey-ance Act. *See* A.R.S. § 44–1001(2).

ration received nothing in exchange for this transfer. On these facts it is difficult to see how any argument could be made that there was "fair consideration" to the corporation in exchange for these conveyances. Jenkins, however, relying upon general contract law principles, urges that consideration may consist entirely of a detriment to a promisee (Jenkins) and be entirely without benefit to the promisor (Valley Distributors). *See Grant v. White*, 103 Ariz. 257, 439 P.2d 828 (1968). From this premise, Jenkins' argument continues, there can be no question that there was a detriment to the promisee (Jenkins) since he gave up all his stock in the corporation. This argument overlooks one basic principle of contract law, and that is that the consideration necessary to support a valid contract must be something bargained for and given in exchange for the promise. *Restatement of Contracts* § 75 (1932); 1 *Corbin on Contracts* § 116, p. 504 (1963).

Here the promise which constituted the detriment to Jenkins was not bargained for by the debtor corporation. The corporation was not even a party to the agreement. Therefore the detriment to Jenkins cannot even be considered as constituting contractual consideration to the corporation for the conveyances of its assets. However, any discussion of contractual consideration is immaterial. The question was not whether there was contractual consideration for Jenkins' promise to convey stock; rather, it was whether the debtor corporation received "fair consideration" for the conveyance of its assets. Valley Distributors received no consideration in the statutory sense. No property was conveyed to Valley Distributors in exchange for the property it gave to Jenkins. Even if the corporation had been a party to the agreement between Jenkins and the Staffs, so as to somehow import adequate consideration to create an enforceable contract, this still would not necessarily bear on the question of what constitutes "fair consideration" within the

meaning of A.R.S. § 44–1003. Under the Uniform Fraudulent Conveyance Act the consideration flowing to the debtor (here, Valley Distributors) must be a "fair equivalent" in exchange for the conveyance made. *See Zellerbach Paper Co. v. Valley National Bank*, 13 Ariz.App. 431, 477 P.2d 550 (1970). Here there was no consideration, fair equivalent or otherwise, given to the debtor corporation in exchange for the conveyance of its assets to Jenkins.

We next consider Jenkins' contention that Spanier and USF&G, who became creditors during the new management of the debtor corporation, did not come within the protection of A.R.S. § 44–1005 because they did not "become creditors during the continuance of such business."[6] The essence of Jenkins' argument is that, inasmuch as the scope of Valley's construction business expanded somewhat after the transfer, the claim cannot be considered as having arisen during the "continuance of such business" within the meaning of the statute. No authority is cited for such a restrictive construction of the statute, and we reject it.

Factually, Valley Distributors was engaged in the general contracting business pursuant to a general contractor's license prior to the transfer, and it continued in that business thereafter. It expanded the scope of that business to some extent by engaging in the construction of swimming pools and contracting for the construction of a medical complex consisting of several small buildings, rather than continuing to engage primarily in the construction of service stations as it had prior to the transfer. However, in our opinion this type of change is immaterial and cannot be relied upon to evade the clear intent of the statute. Valley Distributors was in the general contracting business before the transfer. At the time of the transfer it was contemplated that it would continue to engage in general contracting business, and it contin-

---

**6.** The pertinent language of section 44–1005 provides that "when the person making it [the conveyance] is engaged or is about to engage in a business" the conveyance is fraudulent "as to

creditors and as to other persons who become creditors during the continuance of such business."

ued in the general contracting business after the transfer. Both Spanier and USF&G became creditors during the continuance of such business.

Jenkins' third contention is that the conveyance to him did not leave Valley Distributors with "an unreasonably small capital" and thus cannot be considered fraudulent within the meaning of section 44–1005. Surprisingly, the term "unreasonably small capital" is not statutorily defined. Spanier and USF&G urge that a transfer which makes a debtor insolvent leaves an "unreasonably small capital" as a matter of law. In other words, insolvency constitutes an unreasonably small capital per se. They urge that whether the conveyance has left the debtor with an unreasonably small capital becomes material only when the debtor has not been rendered insolvent.

Although our research has not revealed any decisions which have directly addressed this issue, we find several which have assumed or implied that such was the case. *F. S. Bowen Electric Co. v. United States Fidelity and Guaranty Company*, 256 F.2d 46 (4th Cir. 1958); *Kearney Plumbing Supply Co. v. Gland*, 8 N.J.Misc. 789, 151 A. 873 (1930); *Fidelity Trust Co. v. Union National Bank of Pittsburgh*, 313 Pa. 254, 169 A. 209 (1933); *Julian J. Studley, Inc. v. LeFrak*, 66 A.D. 208, 412 N.Y.S.2d 901 (1979), *aff'd. mem.*, 48 N.Y.2d 65, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979). Even the two decisions most strongly relied upon by Jenkins for his definition of what constitutes unreasonably small capital involved situations in which the court first noted that there was no insolvency involved, and then proceeded to discuss the "unreasonably small capital" issue. *See Zuk v. Hale*, 448 N.H. 813, 330 A.2d 448 (1974); *Holcomb v. Nunes*, 132 Cal.App.2d 776, 283 P.2d 301 (1955).

■ Looking at the language used in the statute, we are convinced that when insolvency is present, there is an unreasonably small capital as a matter of law. Here the facts show that after the conveyance of

corporate assets to Jenkins, the corporation not only had no capital, it had a negative or deficit capital; its liabilities exceeded its assets significantly. We hold that, as a matter of law, this constitutes an unreasonably small capital within the meaning of section 44–1005.

Jenkins urges that such an interpretation is demonstrably contrary to the statutory scheme. He points out that the provisions of section 44–1004 apply only to existing creditors and require a showing of insolvency by the existing creditor before the conveyance will be deemed fraudulent. He then notes that section 44–1005 applies to future creditors and argues that if the requirement of a showing of an "unreasonably small capital" in section 44–1005 can be satisfied by something less than insolvency, then section 44–1005 as so interpreted provides more protection for a future creditor than section 44–1004 provides for an existing creditor.[7] He urges that this could not have been the legislative intent.

On its face this argument has some plausibility, but it fails upon closer analysis. First, we note that the existing creditors can also take advantage of section 44–1005, and therefore the future creditor is not given any statutory advantage over the existing creditor. Second, and more importantly, when sections 44–1004 and 44–1005 are compared, it is readily apparent that section 44–1005 is basically concerned with, and by its terms restricted to, a special class of creditors. That special class is composed of the creditors of a debtor engaged or about to engage in business or a specific transaction. The section is entitled "conveyances by Persons Involved in Business". Under that statute, the only way a future creditor can claim its protection is to show that it became a creditor "during the continuance of such business or transaction." Personal creditors of the debtor are not covered by section 44–1005. It thus appears from the provisions of section 44–1005 that the legislative intent was to give exist-

---

**7.** Although USF&G was arguably an existing creditor to some extent ($4,500), the bulk of its claim and all of the Spanier claim arose from transactions subsequent to the conveyances here involved.

ing business creditors and future business creditors, who became such during the continuance of such business, the right to have a conveyance made without fair consideration deemed fraudulent regardless of intent, upon a showing that it left the debtor with unreasonably small capital, even though the debtor was not rendered insolvent by such conveyance. By contrast, creditors outside the class protected by section 44–1055, i. e., existing personal creditors, are covered by section 44–1004, but only if they can show insolvency.

We therefore hold that inasmuch as the conveyances here involved left Valley Distributors insolvent, this constituted an "unreasonably small capital" as a matter of law. Having arrived at this conclusion, we need not consider Jenkins' arguments concerning how much capital would have been necessary to enable Valley Distributors to continue in the construction business, nor his argument that those capital requirements must be gauged in accordance with the scope of the construction business carried on by Valley Distributors prior to the making of the conveyance in question.

■ In summary, the undisputed facts show that A.R.S. § 44–1005 was applicable to the conveyances herein involved and therefore the Spanier judgment against Jenkins must be affirmed. We thus need not consider whether the Spanier judgment could have been supported pursuant to Spanier's illegal corporate dividend theory.

## THE USF&G JUDGMENT AGAINST JENKINS (CIV–4288)

The principles which have led to the affirmance of the Spanier judgment are equally applicable to the USF&G cross-claim against Jenkins, and require that the USF&G judgment against Jenkins also be affirmed. This affirmance is based upon A.R.S. § 44–1005 and USF&G's status as a

future creditor. For the information of the parties, we reject, except as to the amount of $4,500, USF&G's claim that it was an existing creditor entitled to rely upon the provisions of A.R.S. § 44–1004.

## THE JENKINS JUDGMENT AGAINST USF&G (CIV 4279)

We have previously indicated in this opinion that this procedurally complex litigation resulted in three separate judgments. We have already discussed two of these, the Spanier judgment against Jenkins in the amount of $144,854.79, and the USF&G judgment against Jenkins in the sum of $105,998.94. There remains to be considered the third judgment. This third judgment was entered against USF&G in favor of Jenkins in the amount of $144,-854.79, and is the subject of USF&G's appeal in CIV–4279.

The Jenkins judgment resulted from a counterclaim[8] against USF&G filed by Jenkins in the Spanier litigation. The Jenkins counterclaim sought indemnification from USF&G for any judgment which the Spaniers might recover against the Jenkins. In this appeal, USF&G attacks the entry· of that judgment on both procedural and substantive grounds.

Considering first the procedural grounds, contrary to the expectation of the parties, when the trial judge submitted the Jenkins counterclaim against USF&G to the jury, he did not submit two separate forms of verdict, one in favor of Jenkins and one against Jenkins on that counterclaim. Rather, the only form of verdict submitted to the jury on this counterclaim provided for a judgment in favor of Jenkins.[9] When the jury returned its verdicts, the one verdict submitted to it relating to the Jenkins counterclaim against USF&G was returned unsigned. Since the jury obviously had an opportunity to return a verdict in Jenkins'

---

8. Arguably, this should have been denominated as a cross-claim. In this opinion, however, we follow the terminology utilized by counsel.

9. In all, five separate forms of verdict were submitted to the jury: one for and one against Spanier on Spanier's complaint against Jen-

kins; one for and one against USF&G on USF&G's cross-claim against Jenkins; and only one on the Jenkins' counterclaim for indemnity against USF&G, that one form being in favor of Jenkins.

favor on the Jenkins counterclaim and refused to do so, USF&G was of the view that this indicated that the jury would have rendered a verdict in favor of USF&G on the Jenkins counterclaim if a form of verdict had been available upon which to do so. Accordingly, USF&G moved for judgment in its favor upon the verdict as to the Jenkins' counterclaim. The trial judge denied that motion, and eventually entered judgment in favor of Jenkins.

We have not set forth in detail the full extent of the record relating to the lack of a jury verdict on the Jenkins counterclaim against USF&G. However, in our opinion, appellant USF&G has set forth a well reasoned and legally sufficient basis pursuant to which the trial judge should have found that the intent of the jury was sufficiently certain to justify the entry of judgment in favor of USF&G based upon the jury's action. *See generally Smith v. Tang,* 100 Ariz. 196, 412 P.2d 697 (1966); *Southern Pacific Railway Company v. Mitchell,* 80 Ariz. 50, 292 P.2d 827 (1956). However, our decision that the Jenkins' judgment must be reversed is not based upon this procedural anomaly. Rather, we base our reversal on what we determine to be a complete lack of any substantive basis for the assertion by Jenkins of an indemnity claim against USF&G.

■ The substantive issue raised by USF&G on its appeal from the Jenkins judgment is stated as follows:

"Where a defendant [Jenkins] is found liable for a fraudulent conveyance, does a claim lie against a third party [USF&G] for indemnity where the third party took no part whatsoever in the fraudulent transaction?"

Under Arizona law, and under the facts of this case, we hold that the issue must be answered in the negative.

Factually, Jenkins admits that USF&G was not connected in any way with the transfer of corporate assets from Valley Distributors to Jenkins. Also, it is unquestioned that the only basis for a finding that Jenkins was liable to Spanier resulted from that transfer of assets. Certainly these facts would not permit Jenkins to claim indemnity from USF&G under any theory recognized by the legion of Arizona appellate decisions commencing with the Arizona Supreme Court's opinion in *Busy Bee Buffet, Inc. v. Ferrell,* 82 Ariz. 192, 310 P.2d 817 (1957), and continuing to the present. *City of Phoenix v. Kenly,* 21 Ariz.App. 394, 519 P.2d 1159 (1974), illustrates the principles consistently applied by the Arizona courts in determining non-contractual indemnity claims:

"*Busy Bee* and *Crouse [Crouse v. Wilbur-Ellis Co.,* 77 Ariz. 359, 272 P.2d 352 (1954)] only permit indemnity where the party seeking indemnity *was not personally at fault* and did not actively participate in the wrong causing injury to the third party, but was nevertheless liable because of the legal duty to the third party for the conduct of the indemnitor who actively caused the injury." (citations omitted) (emphasis added).

*See also Allison Steel Manufacturing Co. v. Superior Court,* 22 Ariz.App. 76, 523 P.2d 803 (1974); *Stroud v. Dor-Oliver, Inc.,* 112 Ariz. 403, 542 P.2d 1102 (1975).

Applying the foregoing consistent decisional law to the present facts, the party seeking indemnity, Jenkins, was personally at fault. He took the assets of the corporation without exchanging fair consideration for them. Essentially Jenkins disregarded the corporate entity and treated its assets as his own by withdrawing them from the corporation. This the law does not allow. Having chosen to utilize the corporate entity, he must accept the burdens along with the benefits. He cannot treat the corporate assets as his own to the detriment of creditors, leaving a hollow corporate shell to deceive an unsuspecting public.[10] Jenkins' personal wrongdoing in transferring assets to himself caused the injury (the fraudulent conveyance) to the Spaniers and resulted in

---

10. We do not intimate, nor is there evidence to suggest, that Jenkins withdrew the corporate assets with any actual fraudulent intent.

the Spanier judgment against Jenkins. Jenkins was not held vicariously liable for the conduct of USF&G in fraudulently conveying corporate assets; USF&G took no part in that conveyance.

We have had some difficulty in ascertaining a basis or theory for Jenkins' assertion of an indemnity claim against USF&G. However, it appears that the essence of Jenkins' theory can be summarized as follows. In the months following Jenkins' acts which rendered the corporation insolvent, USF&G issued several construction bonds [11] on behalf of the insolvent corporation without adequately investigating its financial resources. Jenkins urges that if USF&G had adequately investigated, it would have determined that the transfers to Jenkins had rendered the corporation insolvent, and therefore no bonds would have been issued.[12] Thus, Jenkins' argument continues, it was the issuance of bonds by USF&G that enabled the insolvent corporation to continue in business and constituted the *active* cause of Valley Distributors' continuing contracting activities, while Jenkins' prior act in taking the assets of the corporation and rendering it insolvent allegedly constituted at the most a *passive* relationship to those continuing contracting activities.

Although Jenkins makes a valiant attempt to bring his claim within the "active-passive" rationale of *Busy Bee, supra,* the attempt goes far afield. The argument does not focus upon the wrong which resulted in Jenkins' liability. The continuing contracting activities of Valley Distributors did not constitute the wrong which formed the basis for holding Jenkins liable to Spanier. The wrong upon which Jenkins' liability was based was his own personal act, which consisted of his wrongful transfer of corporate assets to himself. USF&G had no connection with that wrong, active or passive.

Nevertheless, from a letter written by the trial judge accompanying his minute entry ruling, it appears that he accepted Jenkins' indemnity theory:

"... Jenkins' wrong was greed perhaps by attempting to get every last dollar from his business .... U.S.F.&G.'s wrong was in not making the necessary inquiries prior to issuing bonds to Valley Distributors. Because this is the Company's business and for which it is paid, the issuance of the bonds was the wrong, or the participation is the wrong to Spaniers, which meets the standards of *Busy Bee Buffet* and *Thornton.*"

The problem with this analysis is that, even if the alleged conduct of USF&G could have been considered as constituting an actionable wrong to Spanier,[13] it would have been a completely independent and separate wrong from the wrong which Jenkins committed and *which formed the basis of Jenkins' liability to Spanier.* Jenkins acted and he was not without personal fault. He cannot assert a right to indemnity from another when it is his own independent wrongful act which constitutes the basis of his liability. *Transcon Lines v. Barnes,* 17 Ariz.App. 428, 498 P.2d 502 (1972); *Thornton v. Marisco,* 5 Ariz.App. 299, 425 P.2d 869 (1967).

In summary, we find no conceivable basis in either the pleadings or the evidence to support the submission of the Jenkins' counterclaim to the jury. We therefore hold that the Jenkins' judgment against USF&G for indemnity must be reversed, and judgment entered in favor of USF&G on the Jenkins' counterclaim.

## THE USF&G CROSS–APPEAL FOR ATTORNEYS' FEES (CIV–4288)

In the trial court, Spanier and USF&G sought an award of attorneys' fees incurred

11. The only bond issued by USF&G in connection with the Valley Distributors-Spanier contract was a 5% bid bond in the amount of $22,000.

12. There was no evidence that USF&G or Spanier ever knew of the transfer of corporate assets or the corporation's true financial condition of insolvency resulting from the Jenkins

transfers prior to the making of the Valley Distributors-Spanier contract.

13. We do not imply that USF&G's activities constituted any actionable wrong to Spanier, apart from any contractual liability which resulted from its issuance of a bid bond on the Spanier job.

by them in prosecuting their claims against Jenkins. It was stipulated in the pretrial statement of the parties that the attorneys' fees issue would be submitted to the court following the return of the jury verdicts. Upon considering this issue after trial, the court refused to award attorneys' fees to either Spanier or USF&G. USF&G asserts that the trial court erred in refusing to award it attorneys' fees against Jenkins, and has raised solely that issue in its cross-appeal in CIV–4288.

USF&G's first contention is that as a successful plaintiff in its garnishment action against Jenkins, A.R.S. § 12–1591 entitles it to an award of attorneys' fees. We reject that contention.

A.R.S. § 12–1591 provides as follows:

"A. When the garnishee is discharged upon his answer, the cost of the proceeding, including reasonable compensation to the garnishee, shall be taxed against plaintiff.

"B. When the answer of the garnishee is not controverted and the garnishee is held thereon, the costs as provided in subsection A of this section shall be taxed against defendant.

"C. Where the answer is controverted the costs shall abide the issue."

In the present case, since the answer of the garnishee, Jenkins was controverted, the provisions of subsection C that "the costs shall abide the issue" are applicable. We agree with USF&G that the winning party in a trial resulting from the controverting of the garnishee's answer is entitled to an award of "costs" against the losing party. *See Gulf Homes, Inc. v. D.M. Federal Credit Union*, 125 Ariz. 68, 607 P.2d 387 (App.1980). This is the only reasonable interpretation of the statutory language. We disagree, however, with USF&G's contention that the word "costs" as used in section 12–1591 includes the allowance of attorneys' fees *to the plaintiff*.

■ We start with the well-settled precept that under Arizona law the word "costs" does not include attorneys' fees, and that attorneys' fees are generally not recoverable in the absence of some contractual or statutory basis for their award. *State Farm Mutual Automobile Ins. Co. v. O'Brien*, 24 Ariz.App. 18, 535 P.2d 46 (1975). Recognizing the validity of this precept, USF&G urges that under section 12–1591 the meaning of the word "costs" has been expanded so as to include "the cost of the proceeding, including reasonable compensation." USF&G then correctly urges that "reasonable compensation" includes attorneys' fees, see *Gulf Homes, Inc., supra*, and concludes that, as a successful plaintiff in the trial of the garnishment proceedings against Jenkins, it should have been awarded attorneys' fees.

■ The problem with USF&G's statutory analysis is that it has omitted and ignored crucial limiting language found in the provisions of section 12–1591 which expand the normal definition of costs. The inclusion of "reasonable compensation" in the "costs of the proceedings" is expressly limited to "reasonable compensation *to the garnishee*." A.R.S. § 12–1591A. (Emphasis added.) Thus, there is nothing in the language of A.R.S. § 12–1591 which would justify a conclusion that the intent was to expand the costs awarded *to the plaintiff* pursuant to subsection C so as to include "reasonable compensation" and accordingly, attorneys' fees, to him.

The policy evidenced by the provisions of section 12–1591, as well as by other provisions of our garnishment code,[14] is obviously to give some degree of extra protection and compensation to the garnishee who is dragged into litigation which normally has resulted from a controversy existing primarily between other parties. To effectuate this policy section 12–1591 allows the garnishee to recover its expenses involved in the garnishment proceeding, including

14. A.R.S. § 12–1582 provides:

"Actions in garnishment in which an answer has been filed by a garnishee shall not be dismissed except upon notice to the garnishee and an opportunity to be heard upon the question of allowance of garnishee's costs and attorney's fee."

attorneys' fees, under the circumstances set forth in the statute. The statute does not extend the right to reasonable compensation, including attorneys' fees, to a successful plaintiff, and if USF&G is to be entitled to recover such fees from Jenkins, its right to do so must be based on some foundation other than the provisions of section 12–1591.

None of the cases cited by USF&G support its contention that section 12–1591 mandates or authorizes an award of attorneys' fees to a successful plaintiff in a garnishment proceeding. *Sandia Development Corp. v. Allen*, 86 Ariz. 40, 340 P.2d 193 (1959), merely involved a remand in which the trial court was directed to determine the extent to which the *garnishee* was entitled to recover attorneys' fees. In *Kuffel v. United States*, 103 Ariz. 321, 441 P.2d 771 (1968), the attorneys' fees were not claimed pursuant to the garnishment statute, but rather, under a "creation and protection of the fund" theory. The Texas decisions cited by USF&G as persuasive in interpreting our garnishment statute simply do not stand for the proposition that the statute authorizes an award of attorneys' fees to a successful plaintiff against a litigating garnishee. These cases merely state that the plaintiff's *costs* may be taxed against the unsuccessful litigating garnishee, without discussion of the statutory language, or any indication that the costs include the plaintiff's attorneys' fee. *See Holt's Sporting Goods Co. of Lubbock v. American National Bank of Amarillo*, 400 S.W.2d 943 (Tex.Civ.App.1966); *Presnall v. Stockyards National Bank*, 151 S.W. 873 (Tex.Civ.App.1912), aff'd., 109 Tex. 32, 194 S.W. 384 (1917). We therefore reject USF&G's contention that the trial court erred in denying his claim for attorneys' fees pursuant to A.R.S. § 12–1591.

We next consider USF&G's contention that its fraudulent conveyance claim against Jenkins arose out of contract, and therefore USF&G was entitled to an award of attorneys' fees pursuant to the provisions of A.R.S. § 12–341.01. We note that A.R.S. § 12–341.01 is inapplicable to actions commenced prior to its effective date. *Bouldin*

*v. Turek*, 125 Ariz. 77, 607 P.2d 954 (Ariz. 1979). Since this action was commenced prior to the effective date of the statute, the statute is inapplicable.

▮ The final contention urged by USF&G is that it should have been awarded attorneys' fees "under the general rule applying to litigation based on the wrongful act of the defendant, and its corollary that attorneys' fees are recoverable in every fraudulent conveyance action." As authority for this "general rule", USF&G cites *United States Fidelity & Guaranty Co. v. Frohmiller*, 71 Ariz. 377, 227 P.2d 1007 (1951), which in turn quotes from 22 Am. Jur.2d, *Damages* § 166, at 235 (1965), as follows:

"Another noteworthy exception to the general rule [that fees are not recoverable] is stated . . .: 'It is generally held that where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as legal consequences of the original wrongful act and may be recovered as damages.' " 71 Ariz. at 380, 227 P.2d 1007.

As pointed out by Jenkins, this exception to the general rule is further clarified in 22 Am.Jur.2d:

"In order to recover attorneys' fees under this principle, the plaintiff must show: (1) that the plaintiff had become involved in a legal dispute either because of a breach of contract by the defendant or because of the defendant's tortious conduct; (2) that the dispute was with a third party—*not with the defendant*; and (3) that the plaintiff incurred attorneys' fees connected with that dispute." 22 Am.Jur.2d *Damages* § 166 (1965) [Emphasis added; footnotes omitted.]

These authorities do not support an award for attorneys' fees against a defendant for litigating with that defendant. *Treat v. Nowell*, 37 Ariz. 290, 294 P. 273 (1930), relied on by USF&G, is not in point,

**600**

since it involves attorneys' fees which were incurred in other litigation.

USF&G's bald statement that attorneys' fees are recoverable in every fraudulent conveyance case is certainly not borne out by its citations of authority. In *Lazar v. TowneHouse Restaurant Corp.*, 6 N.Y.2d 923, 190 N.Y.S.2d 997, 161 N.E.2d 211 (1959), apparently some special statute expressly authorized the award of attorneys' fees there made; *Denham v. Shellman Grain Elevator, Inc.*, 123 Ga.App. 569, 181 S.E.2d 894 (1971), did not even involve a suit against a fraudulent conveyance grantee, but rather involved an action against the defendant for the defendant's conversion of the plaintiff's assets; likewise, neither *Mayock v. Splane*, 56 Cal. App.2d 563, 132 P.2d 827 (1943), nor *In re Mecke's Estate*, 166 Kan. 400, 201 P.2d 1030 (1949), involved actions based upon fraudulent conveyance theories. We do recognize that there is authority for the award of attorneys' fees to a plaintiff in a fraudulent conveyance action when that plaintiff has by his efforts created a common fund for the benefit of other creditors. *See Third National Bank of Nashville v. Keathley*, 35 Tenn.App. 82, 242 S.W.2d 760 (1951). No such fund has been created by the efforts of USF&G in this case. Here, USF&G has not even shown the existence of fraud in fact on the part of Jenkins, and the parties concede that Jenkins acted without any fraudulent intent.

Under all the circumstances, USF&G has not demonstrated that the trial judge erred in refusing to award USF&G attorneys' fees on its claim against Jenkins.

The Spanier and USF&G judgments against Jenkins which were the subject of the appeal in CIV–4288 are affirmed. The Jenkins judgment, which was the subject of the appeal in CIV–4279, is reversed, and the matter remanded with directions to enter judgment in favor of USF&G on the Jenkins counterclaim.

CONTRERAS and EUBANK, JJ., concur.